IN RE APPEAL OF GARY M. LANE FOR ADMISSION TO THE
NEBRASKA STATE BAR ASSOCIATION.
GARY M. LANE, APPELLANT, V. BAR COMMISSION OF THE
NEBRASKA STATE BAR ASSOCIATION, APPELLEE.

544 N.W.2d 367

Filed March 8, 1996.   No. S-34-950002.

Robert B. Creager, of Anderson, Creager and Wittstruck, P.C., for appellant.

Denzel R. Busick, of Luebs, Leininger, Smith, Busick & Johnson, for appellee.

WHITE, C.J., CAPORALE, FAHRNBRUCH, LANPHIER, WRIGHT, and CONNOLLY, JJ.

PER CURIAM.

Pursuant to Neb. Ct. R. for Adm. of Attys. 15 (rev. 1992), the applicant–appellant, Gary M. Lane, challenges the decision of the respondent–appellee, the bar commission of the Nebraska State Bar Association, to deny his application for readmission to the Nebraska bar through membership in the association.

## SCOPE OF REVIEW

In attorney discipline cases, we review recommendations de novo on the record, reaching a conclusion independent of the findings of the referee; provided, however, that where credible evidence is in conflict on a material issue of fact, we consider and may give weight to the fact that the referee heard and observed the witnesses and accepted one version of the facts rather than another. *State ex rel. NSBA v. Woodard, ante* p. 40, 541 N.W.2d 53 (1995); *State ex rel. NSBA v. Ogborn*, 248 Neb. 767, 539 N.W.2d 628 (1995). Under rule 15 we also so review a determination of the bar commission.

## FACTS

At various times Lane was admitted to the bars of Colorado, Iowa, Nebraska, Texas, Virginia, and Washington, D.C. He permitted the Nebraska membership obtained in 1978 to lapse, and in 1994 when he again applied for admission to the Nebraska bar, he no longer held membership in the Iowa bar.

Noting that Lane had failed to list in his application any employment from October 1990 through October 1994, the association's admissions clerk, Jim L. Henshaw, wrote for an explanation. Lane responded by letter that he was unemployed during that period of time. However, in a later letter to the association's executive director, James Sajevic, Lane admitted that he had been employed in temporary jobs during the questioned period of time.

The commission then received information indicating that Lane had exhibited threatening, confrontational, obnoxious, and paranoid behavior. Henshaw wrote Lane requesting his appearance before the commission. Lane appeared, and the

commission thereafter advised him that it would continue its background investigation, but that pending the results thereof, he would be permitted to sit for the February 1995 bar examination if he desired to do so. Lane took the examination and was notified that he had passed and that the commission was continuing its investigation.

After the investigation was concluded, the commission advised Lane's attorney by letter that it had concluded Lane lacked the current character and fitness required for admission to the Nebraska bar. The reasons for the denial of admission were stated to be:

  1. Evidence of hostile, threatening, and disruptive interactions with individuals since . . . Lane has resided in Nebraska.

  2. Lack of candor in completing his application for admission to the bar, including an incomplete disclosure of past employment and an incomplete disclosure of previous bar admissions.

Lane then wrote the commission requesting a hearing pursuant to Neb. Ct. R. for Adm. of Attys. 10 (rev. 1992). Lane's attorney later requested that the commission furnish him with a bill of particulars regarding the reasons for the denial of admission. The commission wrote Lane's attorney that the reasons supporting its decision were:

  1. Lack of candor in completing the application for admission to the Bar.

  A. The application was received on October 31, 1994. Question 2 inquired as to whether he had ever applied for admission to the Bar of any state or applied to take the Bar examination of any state. If so, he was to state the date of the application, the jurisdiction to which he applied, the outcome of the application, and the dates of admission in each jurisdiction. On January 27, 1995, he appeared at a hearing before the Commission and disclosed for the first time that he had been previously admitted in Nebraska and Iowa.

  B. In his Application received on October 31, 1994, he was asked to respond to questions . . . 7 and 8 relating to past employment. The response was to include temporary

or part-time employment for the past 10 years. He did not list any employment since October of 1990. A specific inquiry was made of this matter by letter of November 22, 1994, from Jim L. Henshaw. He responded by letter of November 23, 1994, that he had been unemployed from October of 1990 to the date of his letter. It was not until a letter dated April 11, 1995, to Mr. Sajevic that he admitted to such temporary employment. No details were given. Our investigation has found that he had been employed for temporary employment in March and April, 1993, for Manpower and Apple One Employment.

C. In his Application received October 31, 1994, Question 11 asked if any civil actions or judgments had ever been filed against him. He indicated that such actions or judgments were in existence. He did not attach NSBC Form 3 to the Application. It was not until the hearing of January 27, 1995, that this matter was explained.

2. Evidence of Hostile, threatening, and disruptive interaction with individuals since he resided in Nebraska which reflect upon his character and fitness to practice.

A. At the hearing on January 27, 1995, he discussed his attempts to volunteer at the Creighton Legal Clinic. Catherine Mahern, the Director of the Clinic, has indicated that she and Connie Kearney had a meeting with him to discuss his role in the Clinic. At this meeting in September or October of 1994, it was reported that he was hostile and threatening. The next day, Catherine Mahern asked him to leave the Clinic and not return. He was again threatening, hostile and rude.

B. On or about January 19, 1995, he was in attendance at a BAR-BRI Review at Creighton University. Apparently, he could not locate his keys and began accusing other attendees of taking his keys. Kay Strong was one of the individuals accused. He also accused Corby Gary and threatened to fight him. He also indicated to Mr. Gary that he would find out where he lived. As a result, he was asked to not participate in the BAR-BRI Review. An arrangement was made whereby he could review the

tapes of the sessions by himself. Thomp Pattermann and Laura Pattermann were also witnesses to other disruptive behavior at the review sessions before he was asked to leave. Robert J. Launbenthal, an active member of the Nebraska and Iowa Bars, observed him making inappropriate and demeaning statements to a security guard at Creighton Law School during the early days of the BAR–BRI Review.

C. Shortly after his dismissal from the BAR–BRI Review, he spoke by telephone with Kay Coffey and Cindy Lilleoien of NCLE by telephone [sic]. He was rude and threatening to both of the NCLE employees. There apparently had been a controversy regarding whether audiotapes or videotapes would be supplied.

A hearing was then held by the commission, which Lane attended with his attorney. Through his attorney, Lane was permitted to cross-examine witnesses testifying before the commission and to present his own witnesses and evidence, and he himself testified. The commission found there was no evidence to support the assertion that Lane had been rude or threatening toward employees of the NCLE and that he had substantially complied with question 11 on the application by listing a civil judgment against him on his bankruptcy schedules that had been provided to the commission. The commission also found that although Lane failed to reveal his prior admissions to the Nebraska and Iowa bars, as the application form requested, the omission was not the result of an intent to deceive, but that it did indicate a casual attitude about compliance with instructions and the need to fully inform the commission. The commission further found, however, that Lane had acted in a threatening and intimidating manner while at the Creighton University legal clinic and at the BAR–BRI review course. The commission also found that Lane had intended to conceal the history of his temporary employment in Colorado, denoting a lack of candor in the application process.

## REASONS FOR APPEAL

Rule 15 provides: "The notice of appeal shall be accompanied by a written statement . . . setting forth the nature

of the case, the reason for the appeal, and the facts and pertinent authorities upon which the applicant relies."

Lane asserts seven reasons for appealing which, restated and summarized, claim that (1) the denial was untimely, (2) the evidence does not support the denial, and (3) the procedure employed in reaching the decision and reasons articulated for the denial deprive Lane of the due process and equal protection of the law guaranteed by the Constitutions of the United States and of this state.

## TIMELINESS

In averring that the commission's decision was untimely, Lane urges that it should have made its decision before permitting him to sit for the bar examination and that once the commission permitted him to take the examination, it was precluded from holding subsequent hearings into his fitness and character or passing on questions relating thereto.

Rule 10 provides in relevant part as follows:

> Any applicant who has failed to pass the bar examination or to be admitted on motion, or who has been refused permission to take the examination, may, within 30 days after the mailing of the notice of failure, or refusal of permission, or denial of admission on motion, request a hearing before the bar commission.

Lane concludes therefrom that the only persons entitled to a hearing are those who (1) failed the bar examination, (2) were denied admission on motion, or (3) were refused permission to sit for the examination. He implies that because applicants in his position are not specifically referenced as being entitled to a hearing, it is inappropriate for the commission to continue its investigation into such an applicant's character and fitness. However, this contention fails to take into account Neb. Ct. R. for Adm. of Attys. 3 (rev. 1992) (see appendix A), and Neb. Ct. R. for Adm. of Attys. 9 (rev. 1992).

Rule 3 provides, in part: "A record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for denial of admission." As an applicant is not admitted to the Nebraska bar until such time as he or she has taken the oath of admission,

Neb. Ct. R. for Adm. of Attys. 5E (rev. 1992), it follows that a deficient record could constitute the basis of a denial of admission any time until the oath of admission has been administered, including the period of time after the bar examination has been given.

Appendix A, as referenced in rule 3, further empowers the commission to continue investigations into an applicant's character and fitness after the applicant has sat for the bar examination. The appendix states:

> The primary purposes of character and fitness screening before admission to the bar of Nebraska are to assure the protection of the public and to safeguard the justice system. . . .
>
> . . . The bar commission will administer character and fitness screening. It will perform its duties in a manner that assures the protection of the public by recommending for admission only those who qualify.
>
> . . . .
>
> . . . The revelation or discovery of any of the following should be treated as cause for further inquiry before the bar commission decides whether the applicant possesses the character and fitness to practice law . . . .

See *In re Application of Majorek*, 244 Neb. 595, 508 N.W.2d 275 (1993). In order to fulfill its obligations to the public and the justice system, the commission is allowed to continue investigations of possible misconduct even after an applicant has taken the bar examination.

Moreover, rule 9 provides that the commission is "to make recommendations to the court with reference to applicants for admission . . . ." Not only does the rule not place any time restrictions on the performance of that duty, it goes on to provide that the "commission . . . will, prior to the examinations, examine the proofs of qualifications filed in accordance with these rules and may make further investigation as to the qualifications of any applicant as it deems expedient." The rules therefore specifically contemplate that further investigation of an applicant may be necessary after the initial investigation made prior to the examination being given.

Were the situation otherwise, an applicant could commit with impunity any number and variety of transgressions after taking the bar examination, for both the commission and this court would be powerless to deny admission to the bar. The first reason for appealing is therefore without merit.

## EVIDENCE

The second reason rests on Lane's premise that the evidence is deficient in two respects. First, according to Lane, it does not support the conclusion that he was hostile, threatening, and disruptive, and even if the evidence does so, the conduct is not such as warrants denial of admission to the bar. Second, again according to Lane, the evidence that he failed to disclose his previous temporary employment does not support the conclusion that he lacked candor, and if the evidence does so, the conduct does not warrant denial of admission to the bar.

### Hostile, Threatening, and Disruptive Conduct.

At the June 9, 1995, hearing, various witnesses testified to events which occurred during September 1994 and January through February 1995. Two of the events are worthy of discussion.

The first concerns Lane's involvement at the Creighton University legal clinic. Catherine Mahern, an associate professor of law at Creighton, as well as the director of the clinic, and Connie Kearney, an adjunct professor at the clinic, testified that Lane had come to the clinic in the spring or early summer of 1994 and offered to volunteer after school started again. On his first day, September 19, 1994, Lane accompanied Kearney and two law students to a juvenile court hearing. Lane asked to sit with the students at counsels' table, but Kearney told him that he should remain behind the bar. Lane responded that he was a licensed attorney, that he was in good standing, and that he wanted to sit with the students. Kearney again told him that she wanted him to remain behind the bar, to which Lane responded, "I'll remember this." Kearney testified that she took this statement as a threat.

Mahern met with Kearney and Lane to discuss Lane's role in the clinic and to clear up any misunderstandings that might have occurred at the hearing. During the meeting, Lane stated that

Kearney was the type of woman who does not know how to deal with men and is intimidated by them. He also admitted what he had said to Kearney at the hearing and that he did not take it back. He told Mahern that while he could work with students, he would not work with women students. Finally, Lane stated that "those people in Colorado" had gotten to Mahern, that what they had told her was not true, that the record had been expunged, and that they could not prove anything.

The next day, Mahern called Lane into her office and asked him to leave the clinic. Lane became very irritated and said that Kearney and a student were on the phones in the back room talking to each other about him in whispered voices or in code. When Mahern stated that he must have been mistaken, he said in a loud voice, "[D]on't you accuse me of auditory hallucinations, I've been accused of that before and it's not true." On his way out, Lane passed by Kearney's desk and asked that she keep him out of her phone conversations from now on.

Lane testified that he did not intend to threaten Kearney at the juvenile court hearing; he had made the statement to her because he felt she was being deliberately discourteous to him as a lawyer from a neighboring jurisdiction. He also stated that he did not tell Mahern that he would not work with the female students, but, rather, that he would let them approach him if they wanted help and that he would just work with the male students "who apparently didn't find [Lane] very intimidating."

The second event occurred during the BAR–BRI review course at Creighton University law school. During one of the review sessions, Lane left approximately 10 minutes early. After the review session ended, Lane returned and demanded to know who had stolen his keys. Lane used strong and profane language in accusing the students in attendance of stealing his keys. After the students had left the room, Lane said to one of the students, Corby Gary, "[W]e can take this outside and settle this." Lane went on to say to Gary, "I'll find out where you live." Gary testified that the latter statement caused him concern for himself and his wife.

Other events which were mentioned by witnesses at the hearing included intimidating and rude conduct directed at a

security guard and a custodian at Creighton and abrasive behavior during the BAR–BRI review sessions.

In addition, there are other events alluded to in the evidence which cause some concern, especially his interactions with women. His employment history at AppleOne Colorado, Inc., indicates that he had "outbursts in lobby while filling out application," that he was very rude to female employees, and that he walked off one job, allegedly telling a supervisor to have all of his employees see a psychiatrist. Lane testified that he did not quit that shift early, but, rather, was asked to leave because he was "having another one of these disagreements with another one of these women who didn't apparently like me or my demeanor." Lane acknowledged that his being accused of behaving in an intimidating manner toward women is "part of a recurring problem that I've experienced," and that more women tend to find him intimidating than men.

Lane was also discourteous in his answers to various questions put to him by commission members at the hearing:

> Q. Well, it was a stormy night that night, is that correct?
>
> A. No, it was not. We're going to talk about the weather now[?]
>
> . . . .
>
> Q. Aren't you glad you didn't go outside with him?
> A. I think that's kind of a silly question.
>
> . . . .
>
> Q. What's the title of the one that was published?
>
> . . . .
>
> A. . . . . I don't see what relevance this has . . . .
>
> . . . .
>
> Q. Were [the keys] lost?
>
> . . . .
>
> A. I don't understand why this is so important.

Moreover, his correspondence with the commission during the investigation process evidences a sarcastic and cavalier attitude toward it and its responsibilities. One letter to Harold L. Rock, the chairperson of the commission, contains the following:

> I am sure you are cognizant of the ethical obligation attorneys have to be courteous to one another. Mr.

Henshaw clearly disregards this obligation. If Mr. Henshaw does not have an undisclosed agenda perhaps he should be questioned concerning his unnecessary sarcasm. Perhaps my unemployment is not so difficult to understand after all, if this is the attitude of persons in positions of authority.

Another letter to the commission chairperson reads:

I do not think slanderous innuendoes constitute sufficient grounds to deny me a license to practice law in the State of Nebraska. I recognize that you may have a qualified privilege during this process. . . . I note your sarcastic use of the phrase "working with dispatch" in your letter. If the Commission had worked with dispatch on my application, the investigation would have been completed by now. . . .

. . . Apparently, my failure to fail has again found your side "delaying the game". I use the words "your side" because this process has taken on the characteristics of a football match, not an administrative inquiry. Are you hoping that only if you delay long enough, something negative will happen to disqualify me for admission?

. . . My economic burden of your continued refusal to find me fit to practice in the face of overwhelming favorable evidence pales in comparison to the shabbiness of your effort to impune [sic] my professional integrity.

Also of concern is his belief in various conspiracies being aligned against him. In his interview in January 1995, Lane asserted that because as an attorney he had taken on powerful interests in Texas and because Colorado is dominated by Texas investors, Texas businessmen, and Texas finance, there was an effort on the part of various people in Colorado to politically harass him. Lane stated that the reason a judge in Colorado Springs filed an ethics complaint against him was out of political animosity because "she's a conservative judge in a conservative county."

He also attributed the three other ethics complaints filed against him in Colorado to political harassment. According to Lane, clerks, judges, and attorneys were upset that he came to Colorado Springs to set up a law practice because his reputation in Texas had preceded him.

Lane also implies that the commission was politically motivated in its investigation of his character and fitness. This assertion had been made earlier in a letter from Lane to the commission, in which he objected to the "inquisitorial approach to [his] Bar admission that [he] believe[s] to be motivated by personal or political animosity." Furthermore, Lane is under the impression that all of the people who were in the BAR–BRI course were against him, allegedly because of racial animosity they felt toward him (Lane testified that he is part Hispanic, part Italian, and part "Anglo Irish"), and because they may have heard of his reputation.

While any one of the events described above, viewed in isolation, could perhaps be attributed to the pressures of taking the bar examination or perhaps a misunderstanding, taken together these incidents show that Lane is prone to turbulence, intemperance, and irresponsibility, characteristics which are not acceptable in one who would be a counselor and advocate in the legal system.

Accordingly, our de novo review of the record leads us to independently conclude that Lane has exhibited a pattern of acting in a hostile, threatening, and disruptive manner.

Having so determined, we turn our attention to Lane's claim that even so, the behavior does not constitute sufficient relevant conduct to deny admission under the provisions of rule 3.

Rule 3 provides, in part, as follows:

> An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for denial of admission.

Apparently, Lane is arguing that abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, or turbulent conduct does not reflect on his "honesty, trustworthiness, diligence, or reliability." He is wrong.

Appendix A to rule 3 explains that "[a]n attorney should be one . whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them." A record of conduct which shows a

history of abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, or turbulent behavior is not the type of record which justifies the trust of others with respect to the professional duties owed them. Our Code of Professional Responsibility speaks directly to this issue. Canon 7, EC 7-10, provides that a lawyer is obligated to treat with consideration all persons involved in the legal process, and Canon 7, EC 7-37, provides that although ill feelings may exist between clients in an adversary proceeding,

> such ill feeling should not influence a lawyer in his or her conduct, attitude, and demeanor toward opposing lawyers. A lawyer should not make unfair or derogatory personal reference to opposing counsel. Haranguing and offensive tactics by lawyers interfere with the orderly administration of justice and have no proper place in our legal system.

The requisite restraint in dealing with others is obligatory conduct for attorneys because "[t]he efficient and orderly administration of justice cannot be successfully carried on if we allow attorneys to engage in unwarranted attacks on the court [or] opposing counsel . . . . Such tactics seriously lower the public respect for . . . the Bar." *Application of Feingold*, 296 A.2d 492, 500 (Me. 1972). It necessarily follows that "[a]n attorney who exhibits [a] lack of civility, good manners and common courtesy . . . tarnishes the . . . image of . . . the bar . . . ." *In re McAlevy*, 69 N.J. 349, 352, 354 A.2d 289, 291 (1976).

In addition, appendix A declares, in part, that "[t]he public interest requires that the public be secure in its expectation that those who are admitted to the bar are worthy of the trust and confidence clients may reasonably place in their attorneys." When members of the public engage attorneys, they expect that those attorneys will conduct themselves in a professional and businesslike manner. Attorneys who routinely exhibit abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, or turbulent behavior toward others involved in the legal system are not worthy of such trust and confidence. What cannot be permitted in attorneys cannot be tolerated in those applying for admission as attorneys. *In re Martin-Trigona*, 55

Ill. 2d 301, 302 N.E.2d 68 (1973), *cert. denied* 417 U.S. 909, 94 S. Ct. 2605, 41 L. Ed. 2d 212 (1974).

Moreover, the qualities listed in the rule are merely illustrative; "[t]he fact is that in reviewing an application for admission to the bar, the decision as to an applicant's good moral character must be made on an ad hoc basis." *In re Application of Majorek*, 244 Neb. 595, 606, 508 N.W.2d 275, 282 (1993). We therefore join other courts in holding that abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, or turbulent behavior is a proper basis for the denial of admission to the bar. See, *Board of Overseers of the Bar v. Campbell*, 663 A.2d 11 (Me. 1995); *In re Alexander*, 807 S.W.2d 70 (Mo. 1991), *cert. denied* 502 U.S. 885, 112 S. Ct. 241, 116 L. Ed. 2d 196; *Matter of Ronwin*, 139 Ariz. 576, 680 P.2d 107 (1983).

Even if we assume, arguendo, that Lane believes he is the victim of a conspiracy which encompasses various interests in Texas, various people in Colorado, and the commission itself, the sincerity of his belief in this supposed wide–ranging conspiracy against him cannot overcome the requirements for the practice of law. Belief unrelated to reason is a hallmark of fanaticism, zealotry, or paranoia rather than reasoned advocacy. The practice of law requires the ability to discriminate between fact and faith, evidence and imagination, reality and hallucination. *Matter of Ronwin, supra.* While an applicant for admission to the bar is entitled to argue vigorously that the commission erred in its findings and recommendation, and this court would take seriously any substantiation of the existence of bias or misconduct on the part of the commission, a much stronger showing is needed than demonstrated by this record to warrant a conclusion that the commission had acted out of some· type of political or personal animus. See *In re Demos*, 579 A.2d 668 (D.C. App. 1990).

Verbal abuse, unfounded accusations, and the like have no place in legal proceedings. While occasional lapses in decorum can be overlooked, Lane's transgressions exceed occasional incivility, anger, or loss of control. On this record, they form a pattern and a way of life which appear to be Lane's normal reaction to opposition and disappointment.

We agree with and adopt the observations in *Matter of Ronwin*, 139 Ariz. at 583–84, 680 P.2d at 114–15:

> Care with words and respect for courts and one's adversaries is a necessity, not because lawyers and judges are without fault, but because trial by combat long ago proved unsatisfactory.
>
> . . . .
>
> The profession's insistence that counsel show restraint, self-discipline and a sense of reality in dealing with courts, other counsel, witnesses and adversaries is more than insistence on good manners. It is based on the knowledge that civilized, rational behavior is essential if the judicial system is to perform its function. Absent this, any judicial proceeding is likely to degenerate into verbal free-for-all and some, no doubt, into physical combat. . . . [H]abitual unreasonable reaction to adverse rulings . . . is conduct of a type not to be permitted of a lawyer when acting as a lawyer. What cannot be permitted in lawyers, cannot be tolerated in those applying for admission as lawyers.

Our de novo review leads us to independently conclude, contrary to Lane's contention, that his egregious pattern of abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, or turbulent conduct is sufficient relevant conduct to deny him admission to the bar.

### Lack of Candor.

Question 7 of the application read: "List every job you have held for the ten year period immediately prior to the date of this application or since the age of 18, beginning with your present employment, if any. Please include self-employment, clerkships, internships, temporary or part-time employment and military service." Lane explained that he had failed to list the Colorado temporary employment because he held simple common labor jobs, and he may have either misread the question or forgotten about the jobs. We agree with the commission's determination that such an explanation is not credible. The correspondence between Lane and Henshaw set out earlier establishes not only that Lane failed to list the

employment, but that he originally denied having had any employment during the period in question.

In addition, not only did Lane fail to list his former membership in the Iowa bar, but he failed to reveal that he had previously been a member of the bar of this state, the very state whose bar he was again seeking to join. That piece of information was certainly one of the more important and relevant items he could have provided the commission. His explanation that he simply forgot to list it, or that he had run out of space, or that he did not think it was relevant or material, we find to be incredible, despite the somewhat contrary finding of the commission.

Contrary to the commission's implication, we have never held that in order to be found to have lacked candor in filling out an application, an applicant must have had an intent to deceive. On the contrary, in *In re Application of Majorek*, 244 Neb. 595, 604, 508 N.W.2d 275, 281 (1993), we observed that "false, misleading, or evasive answers to bar application questions may be grounds for a finding of lack of requisite character and fitness." While an intent to deceive will reflect on whether such answers are false, misleading, or evasive, and would properly be considered by the commission, an applicant who recklessly fills out an application, as the consequence of which the application contains false answers, is just as culpable of lacking candor in the application process as is the applicant who intends to deceive the commission.

Accordingly, our de novo review of the record leads us to independently find that Lane lacked candor in filling out the application at issue. Moreover, contrary to Lane's contention, we independently find such conduct reflects on Lane's honesty, trustworthiness, diligence, and reliability, and thus provides an additional reason to deny him admission to the bar of this state.

## DUE PROCESS AND EQUAL PROTECTION

While Lane listed due process and equal protection violations among his reasons for appealing, he did not delineate the facts and pertinent authorities upon which he relied in making these claims. We have often held that errors assigned but not argued in a brief will not be considered by this court.

*Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 248 Neb. 651, 538 N.W.2d 732 (1995); *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995); *Records v. Christensen*, 246 Neb. 912, 524 N.W.2d 757 (1994). The reasons for appealing assigned in the written statement filed under rule 15 serve the same function as assignments of error in a brief, namely, to advise the reviewing court of the issues to be decided, in the sense that the reviewing court is informed of the legal bases upon which the contention to be considered is grounded. See, *Coyle v. Janssen*, 212 Neb. 785, 326 N.W.2d 44 (1982); *Cook v. Lowe*, 180 Neb. 39, 141 N.W.2d 430 (1966). Accordingly, just as errors assigned but not argued in a brief will not be considered, so, too, reasons for appealing which are assigned in a written statement filed under rule 15 but which are not argued will not be considered.

Consequently, under the law of this state, Lane's constitutional claims are procedurally barred. Indeed, Lane rejected an opportunity to file a brief in addition to the rule 15 written statement, in which brief he could have provided additional argument for his appeal reasons, had he elected to so do.

## CONCLUSION

For the foregoing reasons, we affirm the commission's decision to deny Lane's application to be readmitted to the bar of this state through membership in the Nebraska State Bar Association.

AFFIRMED.

GERRARD, J., not participating.

WRIGHT, J., dissenting.

The various incidents described by the majority suggest that Lane is at times obnoxious, has a temper, and can be difficult to work with and that these qualities appear to be amplified around women. With this, I cannot quibble. Until today, however, being obnoxious, having a quick temper, and being hard to get along with were not grounds for the extreme sanction of denial of admission to the Nebraska bar. The majority reaches far beyond the current rules governing admission to the Nebraska bar; therefore, I respectfully dissent.

The majority cites two grounds for excluding Lane: (1) Lane's disruptive, threatening, and hostile behavior and (2) Lane's lack of candor.

After reviewing the factual basis for its first allegation against Lane, the majority concludes that "these incidents show that Lane is prone to turbulence, intemperance, and irresponsibility, characteristics which are not acceptable in one who would be a counselor and advocate in the legal system." While I do not approve of such characteristics, there are no bar admission rules for excluding an applicant on such grounds.

The majority states that it has found authority to exclude turbulent or intemperate people such as Lane in Neb. Ct. R. for Adm. of Attys. 3 (rev. 1992). The pertinent portion of rule 3 provides:

> An attorney should be one whose record of conduct justifies the trust of clients, adversaries, courts, and others with respect to the professional duties owed to them. A record manifesting a significant deficiency in the honesty, trustworthiness, diligence, or reliability of an applicant may constitute a basis for denial of admission.

Lane's behavior does not meet this definition. Rule 3 provides authority for the bar to deny admission for behavior which manifests "a significant deficiency in the honesty, trustworthiness, diligence, or reliability" of an applicant. Obnoxious and rude behavior *by definition* simply do not reflect on one's character for honesty, trustworthiness, diligence, or reliability—let alone demonstrate a "significant deficiency" in these traits, as required by rule 3.

Dishonesty and incivility are two vastly different behavioral traits. Rule 3 reaches the former, but simply does not reach the latter. Nothing in the record suggests that Lane has manifested dishonesty toward clients, adversaries, courts, or others with respect to the professional duties owed to them. Rule 3 is not a catchall exclusionary rule reaching all sorts of personality defects in applicants.

The majority explains that we must preclude Lane from membership in the bar in order to protect the public. However, Lane has practiced law in a number of states since being admitted to practice in 1977. Whatever interpersonal problems

Lane may have, they apparently have not led to injury to his clients.

Lane is accused of lacking candor based on two omissions on his bar application. First, Lane failed to report approximately 60 to 100 hours of temporary employment during a 5-week period in 1993. At the commission hearing, Lane could not recall exactly why he left the temporary employment off his application. He thought that he may have either misread the question or forgotten about the jobs. Lane speculated that given that the jobs were short-lived, trivial positions, he may have thought that it was not important to mention them or that he may have been embarrassed to do so. The majority does not find this explanation credible.

Second, Lane failed to report that he was formerly a member of the Iowa and Nebraska bars. Lane noted that there were only three lines available on the application for listing past or current bar memberships. Lane speculated that once he filled in those three lines—with information about his other bar memberships—he intended to attach an extra sheet listing these memberships, but forgot to do so prior to sending in his application.

Whatever the case, an allegation of lack of candor is only probative of one's character for honesty if there is evidence of some intent to deceive, or at least purposeful evasiveness. The record does not show any such intent or even any motive for Lane to deceive the commission. The record shows no disciplinary sanctions against Lane in the omitted states, nor any evidence of malpractice. Lane apparently just filled out his application carelessly.

Nevertheless, the majority concludes that an applicant who "recklessly" fills out an application—and as a result the application contains false answers—is just as culpable of lacking candor in the application process as an applicant who intends to deceive the commission. Consequently, the majority finds that Lane lacked candor in filling out the application and that such conduct reflects on his honesty, trustworthiness, diligence, and reliability. The majority cites this as an additional reason to deny him admission to the bar.

However, the determination of whether someone is dishonest is a judgment about that person's state of mind and about his or her intentions. If the goal of the "lack of candor" standard is to ensure that potential attorneys are not dishonest, then a rule which holds that lack of candor can be established without showing any culpable state of mind is a rule that does not advance its own purpose.

Moreover, such a rule completely ignores the "use of information" instructions that we have issued to the commission. Appendix A to the rules for admission of attorneys states: "In making this determination [of whether the present character and fitness of an applicant qualify the applicant for admission], the following factors should be considered in assigning weight and significance to prior conduct: . . . 10. the materiality of any omissions or misrepresentations." The majority's approach to application omissions ignores factor No. 10. Likewise, we have held that an omission can be material to a consideration of honesty if the omission also demonstrates an intent to deceive, give false answers, or be evasive. See *In re Application of Majorek*, 244 Neb. 595, 508 N.W.2d 275 (1993). Lane's omissions do not establish that he intended to deceive the commission or that he is dishonest.

Under the current rules for admission to the Nebraska bar, I do not believe that Lane can be denied admission.

CONNOLLY, J., joins in this dissent.