Committee on Character and Fitness
No. ADM-2004-176

IN THE MATTER OF BAR APPLICANT ADM-2004-176
(Standing Committee on Character and Fitness)

Argued: June 22, 2005
Opinion Issued: August 18, 2005

*Applicant ADM-2004-176,* by memorandum and orally, *pro se.*

*Janet F. DeVito,* of Concord, by memorandum and orally, for the Committee on Character and Fitness.

PER CURIAM. The applicant seeks admission to the New Hampshire Bar. The standing committee on character and fitness of the New Hampshire Supreme Court (committee) filed two adverse reports recommending that the applicant be denied admission. We issued an order instructing the applicant to show cause why his application should not be denied. *See* SUP. CT. R. 42(5)(k). Thereafter, both parties were allowed to file briefs or memoranda, and oral argument was held. We now deny the application.

Supreme Court Rule 42(5)(a) states: "All persons who desire to be admitted to practice law shall be required to establish their moral character and fitness to the satisfaction of the Standing Committee on

Character and Fitness of the Supreme Court of New Hampshire in advance of such admission." SUP. CT. R. 42(5)(a). The burden of establishing fitness to practice law rests upon the applicant. *Application of Appell*, 116 N.H. 400, 401 (1976). The applicant must prove good moral character and fitness by clear and convincing evidence. *Application of T.J.S.*, 141 N.H. 697, 699 (1997); *In re Mustafa*, 631 A.2d 45, 47 (D.C. 1993). Any doubt concerning character and fitness should be resolved in favor of protecting the public by denying admission to the applicant. *T.J.S.*, 141 N.H. at 702-03.

As a general rule, we accord deference to a fact finder's determination of witness credibility and resolution of disputed questions of fact. Nevertheless, the committee's recommendation is advisory only and neither binds this court nor limits our authority to take action. *Id.* at 699.

The applicant is married and has two children from his current marriage. He also has two children from a former marriage. The applicant has a master's degree in education and a law degree. He has owned and operated his own business for the past twenty years.

The applicant submitted his petition and questionnaire for admission to the bar of New Hampshire on May 1, 2003. He submitted letters of recommendation from many sources, including law school professors, friends, physicians and even a former wife, to the committee over the course of the proceedings. The committee interviewed the applicant on July 1, 2003. After the interview and a follow-up investigation, the committee issued a negative report.

The report highlighted several areas of concern, including: (1) a past due financial obligation; (2) twelve civil matters to which the applicant has been a party, including three divorces; (3) two monetary judgments entered against him; (4) a judgment for past due child support; (5) eighteen motor vehicle violations, of which fourteen had been incurred since 1991; and (6) that he had been fired from one of his jobs. The committee also discussed an order finding the applicant in contempt of the Windham Family Court in Vermont.

The areas of greatest concern to the committee were the applicant's unsubstantiated reports of his effort to fight drug addiction in Montreal and his "apparent disdain for authority . . . that is reflected in the course of his on-going litigation in Windham Family Court."

The applicant requested a hearing before the committee to explain the issues contained in the report, *see* SUP. CT. R. 42(5)(j), at which he was represented by counsel. Following the hearing, the committee voted to submit a second negative report. It found that the applicant had not met his burden of demonstrating the character and fitness required for admission to the bar. The grounds for the committee's finding included: (1)

the applicant's "willful, deliberate and contumacious" conduct before the Windham Family Court in Vermont; (2) the applicant's abuse of the judicial process, including the filing of eighteen motions in a ten-month period; and (3) the applicant's lack of "sufficient positive characteristics of character and fitness to practice law."

The applicant contends that both negative reports of the committee "contain numerous errors, misapprehensions and misquotations. The conclusions of those reports are generally unsupported by substantial evidence."

The applicant further objects to the committee's use of proposed character and fitness standards that have not yet been adopted. The applicant suggests use of the Code of Recommended Standards for Bar Examiners promulgated by the American Bar Association (ABA Standards). AMERICAN BAR ASSOCIATION SECTION OF LEGAL EDUCATION AND ADMISSIONS TO THE BAR AND NATIONAL CONFERENCE OF BAR EXAMINERS, COMPREHENSIVE GUIDE TO BAR ADMISSION REQUIRE-MENTS 1997-98 (1997). The committee has been making determinations of character and fitness without the assistance of formal standards since its inception. Although we have referred to the ABA Standards for guidance in the past, *see T.J.S.*, 141 N.H. at 701, "the fact is that in reviewing an application for admission to the bar, the decision as to an applicant's good moral character must be made on an ad hoc basis." *Appeal of Lane*, 544 N.W.2d 367, 375 (Neb. 1996) (quotation and brackets omitted). We shall rely upon case law and the standards governing practicing attorneys. *See id.* ("What cannot be permitted in attorneys cannot be tolerated in those applying for admission as attorneys.").

The applicant argues that he has demonstrated a commitment to good works. This commitment includes claims that he, among other activities, worked as an inner city school teacher, helped organize taxi drivers in Philadelphia to resist the Teamsters' Union, secretly transported banned books out of communist Czechoslovakia, forced the cleanup of an "asbestos-contaminated area" in Brattleboro, exposed a "longstanding pattern of abuses and gender discrimination" at the Office of Child Support and the Windham Family Court in Vermont, and worked extensively to combat drug addiction in Montreal.

The applicant began his frequent trips to Montreal while in law school. On these trips, according to his testimony, he counseled young drug addicts, passed out anti-drug literature and provided information to law enforcement authorities. The applicant received at least three speeding tickets during trips to and from Montreal while driving under conditions of extreme fatigue and one ticket for a traffic violation in Montreal while trying to locate people he suspected of being drug dealers. He presented

numerous e-mails he has written to police officers in Montreal, containing detailed information about people he suspected of being drug dealers, including license plate and phone numbers associated with persons he suspected of being drug dealers. He sent multiple reports to the Solicitor General of Canada on his view of the drug trafficking situation in general in Montreal, and one report containing allegations that members of the Montreal police force were engaged in trafficking. He also submitted two responsive e-mails from law enforcement officials, one indicating when a particular officer would return from vacation and one providing a contact name for future correspondence.

The applicant's attorney represented to the committee that he had spoken over the phone with two law enforcement officers in Montreal. One officer confirmed to the attorney that the applicant had sent him e-mails. The other officer simply stated that it was his office's policy not to disclose whether someone was working as an informant. Apart from the applicant's testimony, there is no other evidence in the record of any response to the applicant from authorities in Montreal.

We begin by addressing the issue of the contempt before the Windham Family Court in Vermont. The applicant claims the contempt was reversed, and therefore does not reflect poorly upon his character and fitness. In November 2001, the applicant filed a motion to modify the amount of child support he was paying. The Vermont Office of Child Support filed a petition for enforcement of the child support order soon thereafter. The litigation progressed slowly, in part due to the number of motions filed and several canceled hearings. The applicant filed a motion to recuse the first magistrate presiding, which was granted in March 2002. He filed a third-party complaint against the State of Vermont in October 2002, asserting that a discrepancy between a pre-printed form and Vermont Rule of Family Procedure 4(g)(2)(D) about the required time to file an affidavit of income and assets had caused him economic harm. The applicant filed a motion to recuse the new magistrate on February 28, 2003; it was denied. He also filed a complaint with the judicial conduct committee in March 2003, which was dismissed.

On May 20, 2003, the applicant was ordered to provide his former wife, the plaintiff, with certain financial and business records. The presiding magistrate asked opposing counsel to draft the order. According to the applicant, the attorney and the magistrate faxed the order back and forth to make revisions. The final order lacked protective language which the applicant considered vital; the applicant wanted customer information contained in the records sealed so the plaintiff could not contact his customers and harass them, as he claimed she had done in the past. The magistrate had agreed to put such language in the order, but it was

missing from the final order for production of the documents. The applicant was ordered to produce the documents by June 20, 2003.

On June 19, the applicant faxed two motions to the court. One was another motion to recuse the magistrate; the other was a motion for a continuance. The applicant was informed that the court did not accept faxed motions, a fact which he disputes, but he filed his motions by hand on June 24, 2003.

On June 23, 2003, the plaintiff filed a motion for contempt. On July 3, 2003, the applicant filed a "continuation" of his motion for recusal of the magistrate, in which he requested that all of the discovery orders issued by her be quashed. The applicant turned over the requested information on July 22, 2003, at the hearing on the motion for contempt. The contempt hearing did not conclude on July 22 and at its resumption on August 22, 2003, the magistrate found the applicant guilty of contempt of court. The applicant was ordered to pay the plaintiff's attorney's fees in the amount of $1,066.50. The applicant filed two more motions to recuse the magistrate, one of which was dismissed because he filed it *pro se* although he was represented by counsel.

The applicant appealed the finding of contempt, as well as the denials of his repeated motions to recuse, to the Vermont Supreme Court. The Vermont Supreme Court reversed the contempt finding, as the contempt had been purged when the applicant produced the requested documents. The Vermont Supreme Court, however, upheld the imposition of compensatory fines imposed upon the applicant:

> Defendant asserts that he reasonably, mistakenly, or in "good faith" believed that his motions to recuse magistrate Gartner and quash the discovery order relieved him of the obligation to comply with the order. The trial court rejected the claim, finding that defendant's violation was wilful, deliberate, and contumacious, and we discern nothing in defendant's arguments or the record to suggest that the court's finding was clearly erroneous or an abuse of discretion. . . . Nor does defendant's claim that he believed the order to be invalid because it was drafted by opposing counsel, or involved some form of alleged ex parte communication with the court, represent a persuasive defense. . . . Defendant also contends that he was excused from compliance with the discovery order because it omitted an express provision reflecting the magistrate's decision to seal the business records produced. The court here correctly observed that defendant's concerns could have been addressed through a

motion to amend the order, and did not excuse his noncompliance.

The Vermont Supreme Court also addressed the applicant's numerous motions for recusal of the magistrate:

> Viewed in light of these standards [of abuse of discretion], defendant's arguments are entirely unpersuasive. Defendant contends that the administrative judge erred in ruling that the tape of an unrelated proceeding involving magistrate Gartner was irrelevant, but defendant offers no persuasive rationale that the proceeding was relevant to the magistrate's impartiality in *this* proceeding. Defendant also contends that the administrative judge erred in declining to address in any detail defendant's claim that the magistrate committed numerous procedural errors. The administrative judge correctly ruled, however, that legal errors do not demonstrate prejudice ... and—contrary to his claim—defendant has not proved a "pattern" of error demonstrating bias.
>
> ... Defendant additionally cites several questions and comments by the magistrate at a number of hearings, suggesting that they "were not only pointless but bizarre and possibly for psychological effect," as well as "gratuitous," an improper "signal" to opposing counsel, and proof that the magistrate was "less than honest." The cited questions and comments, however, do not remotely support defendant's claims. Finally, defendant contends the magistrate demonstrated bias by failing to sanction opposing counsel for drafting the discovery order without a provision sealing the records to be disclosed, and by engaging in ex parte communications with opposing counsel. The administrative judge correctly noted that the alleged omission may have been a legal or procedural error but did not demonstrate bias, and the alleged ex-parte communication has not been demonstrated.

The applicant contends that the contempt order "was not ignored, it was challenged. There is a difference." We will not, however, substitute our judgment for that of the Vermont Supreme Court. The Vermont Supreme Court upheld the fines imposed by the lower court to the extent that they arose from the defendant's failure to obey the court order: "Under V.R.F.P. 16(c)(3), the court may award a sum of money sufficient to compensate the aggrieved party for any loss, including attorneys' fees, 'caused by the contempt.'" While the applicant's contempt was purged by

July 22, 2003, he was, nonetheless, in contempt of court from June 20, 2003, until he produced the requested documents.

Next we turn to the applicant's response to the committee's finding that he has abused the judicial process, as evidenced by the number of motions he has filed, including several motions to recuse.

The applicant's response to this finding is influenced by his belief that he is fighting systematic abuses prevalent at the Windham Family Court: "Lastly it is difficult to see how a determined effort to reform a Court can be termed abuse of the legal system. As has been extensively documented Windham Family Court cannot be deemed a normal part of the legal system. It is an aberration." He states: "The Committee was unwilling to entertain the possibility that there might be 'deeply ingrained institutional misconduct' or that a person might have a reasonable belief, based on the evidence of many years, that this was true."

It is apparent from his filings, both before this court and the Windham Family Court, that the applicant perceives the Windham Family Court to be a corrupt institution, and that he believes that his attempts to correct its misconduct will have consequences: "It has been known for many years that the neighborhood around Montreal bus station and Windham Family Court were deleterious to the well-being of their respective communities. It ought to be clear that any direct attempt at correcting these situations will entail the risk of severe retaliation."

In responding to the committee's finding that eighteen motions were filed in a period of less than ten months, the applicant states that three of the eighteen motions were made by opposing counsel, and that "six of the motions were made by [the applicant's] lawyer . . . . This was more or less his first case after having been admitted. It was plain to anyone with an ounce of political sense that this entire contempt issue was for the purpose of denying [the applicant] the right to practice law."

The applicant is particularly troubled by the actions of the court manager at the Windham Family Court. In September 2003, the court manager transmitted a copy of the applicant's file at the Windham Family Court to the committee in response to its request. In her letter, the court manager stated, "I would urge you to read [the applicant's] filings carefully, as I believe they greatly reflect upon his fitness and character." She also informed the committee that the applicant had been recently found in contempt of court; a copy of the contempt order was included in the file transmitted. In August 2004, the court manager sent the committee updated filings in the litigation, including a copy of the recent Vermont Supreme Court opinion. The court manager included a letter summarizing the events. This package was also sent to the Vermont Board of Bar Examiners.

The court manager's summary of the litigation did not sway our decision. Whether her actions were improper is not a question we need to decide. We did not include in our analysis the applicant's reactions to the court manager's actions. We need only say that, after reviewing the entire court file, we are not convinced that the applicant's reactions to the *other* perceived instances of prejudice and misconduct were warranted by the situation. His reaction to the contempt finding, his motions to recuse the magistrate and the overall tenor of his pleadings are indicative of his character and fitness to practice law. They suggest an intemperate disposition, and an unusual quickness to find fault with others.

Next we address the committee's general finding that the applicant lacked "sufficient positive characteristics of character and fitness to practice law." Specifically, the committee found that:

> 3. [The applicant] has shown an inability to exercise the reason and good judgment a lawyer should have and has shown a disregard for the rights and welfare of others in that:
>
> a. [The applicant] has a pattern of blaming others for the negative events in his life. Those he blames include courts, judges and allegedly corrupt police.
> b. [The applicant] often creates unnecessary problems for those he deals with in guise of solving society's problems.
> c. [The applicant] has harmed his own children, and others in his family while attempting to fix what he feels to be a corrupt and biased legal system.
> d. [The applicant's] conduct in litigation could be found to violate Rules 3.1 and 3.2 of the Rules of Professional Conduct if he were an attorney.
> e. [The applicant] had difficulty focusing on the specific issues the committee asked him to address and often rambled about irrelevant subjects.

The applicant responds that he does not view the events at the Windham Family Court as negative because he appreciates the opportunity to stand up for what is right. He also challenges the committee's finding that he is hurting his children in his efforts for reform. In the midst of his legal struggles with his former wife over his motion to modify child support, the contempt against him and his many motions to recuse, the applicant filed a motion to enforce an order for parent-child contact. He claimed that the Vermont statute requires a hearing to be held within thirty days after such a motion is filed, but that no such hearing has taken place.

The applicant laments this fact: "Where's the justice, where's the decency, where's the law, who protects the children?" But when questioned by members of the committee, the applicant revealed that he has ignored his own request to enforce the visitation order. The applicant has focused his energy upon the contempt issue, the motions for recusal and the alleged misconduct at the Windham Family Court. As the following excerpts from the hearing transcript indicate, the applicant has shown more fervor in pursuing the claimed misconduct at the Windham Family Court than he has in pursuing his right to see his children, though he claims to be representing their interests:

| | |
|---|---|
| Mr. [Willard] Martin: | And in this order appointing the guardian, the judge did not set down a date by which the guardian was to complete his or her work? |
| Applicant: | No, I believe that is not—that's the case. And this is my criticism, that the best interests of the children have been lost. |
| Mr. [Willard] Martin: | But here, sir, you have been spending your time reporting the master, or the magistrate, to the Judicial Conduct Committee, you've been filing these motions to recuse, and you're not asking when the guardian's report is due, when you're gonna have a hearing on visitation. It seems to me that it's all topsy-turvy. And I believe you when you say that your children are very important to you, I don't doubt that, but it seems to me that—you know that saying about representing yourself . . . . |
| Applicant: | I know. I know. I shouldn't be representing myself here. I can't afford an attorney for Vermont matters. . . . |
| | . . . . |
| Mr. [Willard] Martin: | I only bring up these questions, because it's a question of how you view your role as a lawyer, and whether you have the fitness to recognize what the important issue is in moving on, and placing the interests of the client, which would in a derivative way include your own children |

at this point in time, over the good of the general public.

Despite the clear evidence that the applicant never followed through with his motion to enforce an order for parent-child contact, he blames the presiding judge: "Now it is *seventeen times the legal limit* [since a hearing should have been held] and Judge Hayes still has failed to schedule a hearing. Yes, [the applicant] does hold Judge Hayes accountable and does assign blame."

We are troubled by the applicant's perception that relatively minor events occur for specific, and sometimes nefarious, reasons. For example, when his former wife's attorney did not put the required protective language into the order requiring him to produce certain financial and business records, the applicant did not "believe that the omission of the vital protective order was accidental." The applicant also believes that the Vermont Supreme Court order was written with his New Hampshire bar admission application in mind:

> The original contempt finding was condemned by the Supreme Court partially because it, "focused on punishment and not upon compliance." The Vermont Supreme Court was well aware that the case had Bar Admission implications. Indeed the circumstances indicate that the New Hampshire Committee was the intended audience. [The applicant] suggests that the Vermont Supreme Court's disapproval of finding that [*sic*], "focus on punishment and not upon compliance," refers not only to the clear excessiveness of the award, but also indicated disapproval of the use of a finding of contempt for Bar Admission purposes as well as the extravagant language used to achieve that result.

He also suggests that the standards proposed by the committee, but not yet adopted, were written specifically for his case:

> This is precisely the wrong time to use an unapproved standard, written by the very [c]ommittee using it for the first time and (apparently) drafted during the pendancy [*sic*] of the present case. [The applicant] . . . has no way of knowing if the standards were drafted with this very case in mind. The Committee's Commentary *seems* to suggest this but again, there is no way for [the applicant] to know if this is the case.

The applicant suggests that he was initially ordered to pay damages for items not related to his contempt because, while he knew of only a few cases of ethical violations,

the malefactors at Windham Family Court knew about hundreds of cases and knew that [the applicant] would press for a full State investigation. If [the applicant] can be discredited there is less chance for scrutiny into areas that Judge Hayes and Attorney Annis wished to keep buried. This is why the overturned contempt opinion was written with such vituperative language and full of easily avoided errors of fact that *were not corrected when they were pointed out with great clarity in the Motion to Reconsider.*

Judges and magistrates are people, who despite their best efforts, fall prey to the same mistakes, oversights and misunderstandings that beset the rest of humanity. The existence of our appellate system is an explicit recognition that errors will occur. The applicant has shown a worrisome tendency to treat mistakes, if any, made by magistrates, judges, court personnel and the committee as signs of prejudice against him.

We are also troubled by the reasoning displayed in the applicant's arguments and the conclusions drawn therefrom, before this court, the committee and the Windham Family Court. For example, in a paragraph set off on its own in his memorandum of law, he asks, "Is it more comfortable to believe that [the applicant] has disdain for authority, than to consider that the lawlessness at Windham Family Court is probably the indirect cause-in-fact of domestic violence?"

In his response to his former wife's motion for contempt, the applicant deduces "unethical and disingenuous" conduct from a mistake made by opposing counsel:

3. The discovery process has been marked by conduct on the part of Attorney Corum that appears to be unethical and disingenuous. For example, an earlier Discovery request asked for "all corporate records" of [the applicant's business]. Mr. Corum knew, or ought to have known, that [the applicant's business] is not and has never been a corporation.

The applicant somehow detects "unethical and disingenuous" conduct from his former wife's attorney's minor error. This is *not* an example of such conduct. Rather, it is an example of how the applicant tends to take small incidents and blow them out of proportion. Similar small occurrences were behind his motions for recusal; for example, the absence of the protective language from the document production order led to a motion to recuse the presiding magistrate.

The applicant also views the wrongs allegedly done to him on an exaggerated scale. For example, he draws the following parallel to the

alleged *ex parte* communication, of which the Vermont Supreme Court found no evidence, between the magistrate and his former wife's attorney:

> [The applicant] states his great-grandfather decided to leave St. Petersburg and come to America because the Czar, under the influence of the mesmerizing Rasputin, had decreed that Jews could sell watches, repair watches but not both. This has given [the applicant] blood-memory of the nature of violations of Substantive Due Process. Over 120 years after the Czar's edict, [the applicant's daughter] will have a similar blood-memory of the nature of an ex parte communication.

He also displays a general hostility to the committee throughout his pleadings: "Again, this is an argument so absurd that only a lawyer could make it."

> Unfortunately the author [of the committee reports] was so dazzled and blinded by the status of these individuals as Judge and Court Employee that he abandoned all skepticism about their veracity, even after he saw that Attorney Annis had written her curious letter claiming that Judge Hayes had been upheld and reading the Vermont Supreme Court opinion which held that Judge Hayes had abused discretion in three separate areas.

In the same document he also writes:

> [The applicant] is loath to be discourteous, but if the author of the [first and second negative reports] can be this wildly inaccurate on this point, and opposing counsel can make a blunder that is equally embarrassing when she was present at the very meeting at which the Chairman did not even realize that there were bi-lateral communication [sic], why should the Court give credence to the other conclusory assertions that are offered without a shred of evidence?

■ Contrary to the applicant's assertion, our review of the evidence indicates that the committee's findings are supported by evidence. The applicant violated a court order, resulting in a finding of contempt. The applicant abused the judicial process in an attempt to reform perceived misconduct. And the applicant has not demonstrated sufficient positive characteristics to support his fitness to practice law.

Abuse of legal process and violation of a court order are two factors considered relevant by the ABA Standards. We find the reasoning of the Massachusetts Supreme Judicial Court in a similar case helpful:

> The conduct of someone else generally is not relevant to the exploration of the applicant's fitness because it sheds no light on the ultimate question: whether the applicant is fit to practice law. Repeated, unsupported, ad hominem attacks on the ethics, integrity, and motivations of others involved in the process do, however, reflect adversely on the applicant's fitness to practice law.

*In re Admission to Bar of Com.*, 828 N.E.2d 484, 498 (Mass. 2005). Even assuming for the purposes of argument that the alleged events at the Windham Family Court took place, they do not rise to the level of prejudice and misconduct that the applicant perceives. Rather, they reflect a tendency to exaggerate on the part of the applicant. "The practice of law requires the ability to discriminate between fact and faith, evidence and imagination, reality and hallucination." *Lane*, 544 N.W.2d at 375. Again we find the language of the Supreme Judicial Court of Massachusetts helpful.

> Moreover his penchant for hyperbolic and dramatic language about what he perceives to be misconduct by others shows a seeming lack of understanding of the seriousness of the accusations he makes. Given all of this, coupled with the petitioner's mischaracterizations of other matters, we cannot say that the petitioner has met his burden of proving that he is fit to practice law.

*In re Admission*, 828 N.E.2d at 501.

In addition, "[t]urbulent, intemperate or irresponsible behavior is a proper basis for the denial of admission to the bar." *Application of Feingold*, 296 A.2d 492, 500 (Me. 1972). These characteristics are not acceptable in one who would be a counselor and advocate in the legal system. *Lane*, 544 N.W.2d at 374.

> When members of the public engage attorneys, they expect that those attorneys will conduct themselves in a professional and businesslike manner. Attorneys who routinely exhibit abusive, disruptive, hostile, intemperate, intimidating, irresponsible, threatening, or turbulent behavior toward others involved in the legal system are not worthy of such trust and confidence.

*Lane*, 544 N.W.2d at 375. "The public interest requires that the public be secure in its expectation that those who are admitted to the bar are worthy of the trust and confidence clients may reasonably place in their lawyers." ABA STANDARDS, *supra* v.

■ We do not challenge the applicant's assertion that he is a moral person. He is committed to helping others, and expresses a deep concern for equality and justice. We do not question these traits. It is his lack of fitness that hinders his ability to practice law. The right to practice law is not an inherent right of every citizen, as is the right to carry on an ordinary trade or business. It is a peculiar privilege granted only to those who demonstrate special fitness in intellectual attainment and character. All may aspire to it on an absolutely equal basis, but not all will attain it. *T.J.S.*, 141 N.H. at 702. Based upon our review of the evidence, we hold that the applicant has not satisfied his burden of proving by clear and convincing evidence his fitness to practice law.

Finally, we turn to the applicant's claims that he has been denied procedural due process. The applicant argues his due process rights have been violated because: (1) he was not provided with the right to confront witnesses against him; and (2) new "charges" against him were added in the second negative report.

> A State cannot exclude a person from the practice of law or from any other occupation in a manner or for reasons that contravene the Due Process or Equal Protection Clause of the Fourteenth Amendment. . . . A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law.

*Schware v. Board of Bar Examiners*, 353 U.S. 232, 238-39 (1957) (citations omitted).

As to his first argument, the applicant was the only witness presenting evidence. Our finding that the applicant has not met his burden of proving his character and fitness to practice law is based primarily upon his own words: his filings before the Windham Family Court, his filings with the committee, his testimony before the committee and his filings with this court.

As to his second argument, that new charges against him were raised in the second negative report, the applicant seems to have confused this inquiry into his character and fitness to practice law with a criminal trial. *See In re Converse*, 602 N.W.2d 500, 506-07 (Neb. 1999). It is not a trial, and the applicant has not been charged with any crime.

This proceeding is intended to determine the applicant's character and fitness to practice law in New Hampshire. The applicant was aware that he would be required to establish his character and fitness to the satisfaction of the committee and this court. *See* SUP. CT. R. 42(5)(a). The applicant

was "on notice that the content of his submissions would be an issue before this court . . . ." *In re Admission*, 828 N.E.2d at 501. Indeed it was by these submissions that he was afforded the opportunity to establish his good character and fitness. He failed to do so.

*Application denied.*

BRODERICK, C.J., and NADEAU, DALIANIS, DUGGAN and GALWAY, JJ., concurred.