## IN THE MATTER OF JAMES M. POOL.

Suffolk.   October 9, 1987. — January 7, 1988.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Attorney at Law*, Disciplinary proceeding, Disbarment, *Supreme Judicial Court*, Membership in the bar. *Practice, Civil*, Membership in the bar.

An attorney, disbarred eleven years after the occurrence of an isolated incident of serious professional misconduct, demonstrated by his conduct both before and after disbarment the degree of trustworthiness that would entitle him to resume the practice of law nearly fifteen years after the incident [464-467], and further, he demonstrated that his reinstatement would not be detrimental to the public welfare nor compromise the integrity of the bar [467-469].

PETITION filed in the Supreme Judicial Court for the county of Suffolk on January 8, 1985.

The case was reported by *Wilkins*, J.

*John P. White, Jr.*, for the petitioner.

*Daniel Klubock*, Bar Counsel.

LYNCH, J. In this case, we are asked to decide whether James M. Pool (petitioner) should be reinstated as a member of the bar of the Commonwealth. The question is before us on the reservation and report, without decision, of a single justice of this court. A hearing panel (panel) of the Board of Bar Overseers (Board) recommended reinstatement, concluding that the offenses for which the petitioner was disbarred were an isolated instance occurring eleven years prior to disbarment, when the petitioner was relatively young and inexperienced. The Board concurred in the recommendation of the panel with no votes to the contrary. We accept the recommendation of the Board.

The petitioner was disbarred on January 17, 1984, for a serious breach of client confidentiality, coupled with failure

to disclose to his client significant facts which had a bearing on the amount of the fee the petitioner received. We relate in some detail the unusual nature of the conduct which led to the petitioner's disbarment.

In March, 1973, the petitioner undertook representation of a client who had been arrested here on a Federal warrant from the Eastern District of Virginia, charging him with the kidnapping of a Mexican national. The petitioner and his client agreed to a fee of $1,500 for representation in the removal hearing.

To establish the client's defense that the alleged kidnap victim had not been kidnapped, but was instead a fugitive from justice, the petitioner engaged the services of a private investigator. As a part of the investigation, it was necessary for the investigator to travel to Mexico in an attempt to procure evidence which would substantiate this defense. When the petitioner expressed his concern that the cost of this investigation was exceeding the $800 he had received from the client for expenses, the client revealed that he had rented under a pseudonym two safe deposit boxes and that the boxes contained a substantial amount of cash as well as a handgun and false identifications. According to the client, these materials were unconnected with the alleged kidnapping; nonetheless, the client wished the materials removed. The keys to the safe deposit boxes were among the client's belongings then in the possession of the Federal Bureau of Investigation (F.B.I.). The petitioner believed, and mistakenly informed his client, that the F.B.I. would be able to locate the safe deposit boxes from the keys.

The petitioner requested the keys from the Assistant United States Attorney assigned to the case, under an order for the return of seized evidence in so far as the material was "not likely to be used as evidence." The petitioner then told the Assistant United States Attorney that he needed the keys to the safe deposit boxes in order to obtain money for his client's defense and that there was nothing incriminating in the boxes. However, he also said that the boxes contained a gun which was not connected to the alleged kidnapping, and, that if he could obtain the keys, he would open the boxes alone, remove

only the money, and disclose the location of the boxes and the alias under which they were listed. The Assistant United States Attorney accepted the offer.

By this time, the client's sister, an attorney practicing in California, was in Boston to help her brother. Under the impression that the petitioner had obtained the keys pursuant to a court order, she was with the petitioner when he removed from the boxes an envelope which contained $48,600. Except for the amount designated for expenses, this money was turned over to the sister. Nothing else was removed from the safe deposit boxes, although it was determined that they contained numerous sets of false identification, including a fictitious passport and the handgun.

The Assistant United States Attorney then obtained a warrant to search the safe deposit boxes. At the petitioner's request, the warrant application stated merely that "further investigation" had revealed the existence, location, and identity of the holder of the boxes. The petitioner never disclosed to his client what he had told to the Assistant United States Attorney.

On April 11, 1973, the day before the client was to be removed to Virginia, the petitioner again visited him in jail. An additional retainer agreement for $7,500 was executed; at the same time, the petitioner agreed to his client's request that he remove the remaining contents from the safe deposit boxes. The next day, he told his client's sister that he would go to the bank alone. Upon his return thirty minutes later, without having entered the boxes, he announced to the sister that the F.B.I. had seized the material from the boxes. His client subsequently learned about the petitioner's role in these events from successor counsel.

As a result of this conduct the petitioner was found to be in violation of S.J.C. Rule 3:07, Canon 1, DR 1-102, as appearing in 382 Mass. 769 (1981) (deceit, misrepresentation); Canon 4, DR 4-101(B)(1) (revealing confidence or secret of a client); and DR 4-101(B)(3), as appearing in 382 Mass. 778 (1981) (using a confidence or secret of a client for his own advantage, without the client's informed consent), and he was disbarred on January 17, 1984. Because the events leading to disbarment

occurred in 1973,[1] and in view of the petitioner's inexperience and otherwise good record, the petitioner was granted the right to seek reinstatement after the passage of one year from the date of disbarment.

On January 8, 1985,[2] the petitioner filed a petition for reinstatement, pursuant to S.J.C. Rule 4:01, § 18, as amended through 394 Mass. 1106 (1985), and a hearing before a panel of the Board of Bar Overseers (panel) was held on September 23, 1985. By memorandum dated January 13, 1986, the panel requested additional relevant evidence, which was submitted by August 20, 1986. On October 27, 1986, the panel recommended that the petitioner be reinstated and the Board of Bar Overseers voted to adopt the recommendation of the panel on November 10, 1986, subject to a requirement, which has since been met, that the petitioner pass the multistate professional responsibility examination.

Under S.J.C. Rule 4:01, § 18(5), as amended, 394 Mass. 1106 (1985), the burden is on the petitioner to demonstrate "that he has the moral qualifications, competency and learning in law required for admission to practice law in this Commonwealth, and that his resumption of the practice of law will not be detrimental to the integrity and standing of the bar, the administration of justice, or to the public interest." This rule is considered to have two distinct requirements. The first addresses the personal qualifications of the petitioner with regard to both competence and learning in law and his moral qualifications. The second requirement concerns the effect of the petitioner's resumption of practice on the integrity of the bar, the administration of justice and the public interest. *Matter of Gordon*, 385 Mass. 48, 51-52 (1982).

---

[1] Hearings before the hearing committee of the Board of Bar Overseers did not commence until 1981 due to the unwillingness of the United States government to permit interviews of the Federal agents and attorney involved in the case.

[2] On December 19, 1984, the single justice amended his order to permit immediate application for reinstatement.

1. *Personal qualifications.* Bar counsel questions the petitioner's present moral fitness and achievement of rehabilitation. The petitioner's disbarment "is conclusive evidence of his lack of moral character at the time of his removal from office. And it continues to be evidence against him with respect to lack of moral character at later times." *Matter of Keenan,* 313 Mass. 186, 219 (1943). The petitioner, therefore, has the burden to "establish affirmatively that since his disbarment he has become 'a person proper to be held out by the court to the public as trustworthy.'" *Id.,* quoting *Boston Bar Ass'n* v. *Greenhood,* 168 Mass. 169, 183 (1897). Although it has been noted that rehabilitation is a "state of mind," *Matter of Allen,* 400 Mass. 417, 425 (1987), "[i]n judging whether a petitioner . . . has demonstrated the requisite rehabilitation since disbarment, it is necessary to look to (1) the nature of the original offense for which the petitioner was disbarred, (2) the petitioner's character, maturity, and experience at the time of his disbarment, (3) the petitioner's occupations and conduct in the time since his disbarment, (4) the time elapsed since the disbarment, and (5) the petitioner's present competence in legal skills" (footnote omitted). *Matter of Hiss,* 368 Mass. 447, 460 (1975).

The offenses for which the petitioner was disbarred were ones which strike at the heart of the fiduciary nature of the attorney-client relationship. See *Berman* v. *Coakley,* 243 Mass. 348 (1923). Moreover, the petitioner's continuing lack of disclosure of the breach of confidence and his agreement with the Assistant United States Attorney evince more than a mere error of judgment. The panel found, however, that the misconduct was an isolated instance which, it should be further noted, arose in highly unusual circumstances. Substantial evidence before the panel of a good record of practice as an attorney in the years intervening between 1973 and the petitioner's disbarment, as well as the fact that the petitioner's misconduct occurred when he had been in sole practice for less than a year, support this finding. See S.J.C. Rule 4:01, § 18 (5).

In 1982, the petitioner moved with his family to West Virginia. His occupation subsequent to disbarment has been as

director of the bicentennial celebrations of Harrison County and the city of Clarksburg, West Virginia. During the course of this employment, the petitioner wrote a book for children and edited an album on the history of the county. The panel found impressive the support of public officials and others who have known the petitioner and his work in West Virginia, some of whom explictly noted their awareness of his disbarment. Letters in support of the petitioner were unanimous in their praise of and respect for the petitioner. We therefore concur with the panel that the petitioner's occupation and conduct since disbarment reflect positively on his present moral fitness.

Bar Counsel, however, argues that certain conduct and statements made by the petitioner raise serious questions whether he has sustained his burden of demonstrating present moral fitness. At the core of this argument is the contention that the petitioner has failed to appreciate the serious nature of the offenses leading to disbarment and has instead blamed others for his own deficiencies. We have examined the complete record of the various proceedings and do not adopt Bar Counsel's interpretation of the petitioner's conduct.

Of Bar Counsel's contentions, two bear most closely on questions of rehabilitation. The first concerns the significance of the petitioner's statement before the single justice to the effect that he did nothing dishonest, a statement which he later explained in the reinstatement proceeding to have been in response to having been called a thief by Bar Counsel. The second concerns the petitioner's failure to make restitution of the $7,500 additional fee, combined with his statement in the reinstatement proceeding that he was unaware that restitution was an issue.

Although the record before the single justice reveals no such statement by Bar Counsel, he did make legal arguments regarding the petitioner's "bad moral character," as evidenced by adjudication of disbarment. We view the petitioner's misapprehension of Bar Cousel's argument as understandable in view of the allegation and prosecution of a claim before the panel that the petitioner had stolen $25,000 from his client's safe deposit box, a charge which was ultimately withdrawn.

Moreover, contrary to Bar Counsel's argument, the petitioner did acknowledge in the reinstatement hearing that his conduct involved dishonesty. Perhaps most importantly, the subjective aspects of questions dealing with state of mind, like matters of credibility, are most appropriately determined by the panel, which has the opportunity to observe and listen to the petitioner directly. *Matter of Gordon, supra* at 55. We see nothing in the record to indicate that the panel's assessment that the petitioner has been rehabilitated was in error.

We now turn to the question of restitution. Although not a controlling consideration, whether restitution has been made is relevant to the determination of the disbarred attorney's rehabilitation. See Annot., 70 A.L.R. 2d 268, § 18 (1960), and cases collected therein. Where an attorney's disbarment is based on misappropriation of clients' or others' funds, failure to make restitution without justification is a strong indication of lack of rehabilitation. See, e.g., *In re Kuta*, 86 Ill. 2d 154 (1981). This was not a case of misappropriation by the petitioner, although the circumstances surrounding the negotiation of the additional fee were material elements in his disbarment. The petitioner's failure spontaneously to return the $7,500 to his former client and his subsequent explanation do not lead us to conclude that he lacks rehabilitation. We reach this conclusion because, first of all, restitution was not required under S.J.C. Rule 4:01, § 24, inserted by 394 Mass. 1106 (1985). Furthermore, neither the findings and conclusions of the panel recommending discipline nor the memorandum of the single justice disbarring the petitioner found the $7,500 fee to be excessive but instead questioned the circumstances under which the agreement was executed. We, therefore, cannot say that it should have been evident to the petitioner that restitution was in order. Moreover, in recommending reinstatement at this time, the panel notes that the petitioner and his former client have entered into an agreement pursuant to which the petitioner has undertaken to make restitution.[3] Under the circumstances of this case, we think this to be sufficient with regard to restitution.

---

[3] By way of a letter to the single justice, the former client has sought to characterize this agreement as having been procured by the petitioner through

In sum, we agree with the board that the petitioner has sustained his burden of demonstrating the degree of trustworthiness which would entitle him to resume the practice of law. As serious as his offenses were, they were committed at a time when he was an inexperienced practitioner confronting an unusual and complex criminal case. Such situational pressures cannot be ignored when assessing the likelihood that such misconduct will recur. See Rhode, Moral Character as Professional Credential, 94 Yale L.J. 491, 555-562 (1985). We recognize that the passage of fewer than five years since disbarment would ordinarily be insufficient for a disbarred attorney to rehabilitate himself. "[A] long time span between disbarment and petition for reinstatement, during which the petitioner's conduct was exemplary, reinforces his claim to rehabilitation." *Matter of Hiss* 368 Mass. 447, 460 n.19 (1975). We note, however, as did the panel, that the petitioner's misconduct occurred eleven years prior to the date of disbarment and the order of the single justice permitted him to apply for reinstatement after one year. In any case, the question remains whether he is presently trustworthy. *Id*. at 456. By his conduct both prior to and subsequent to disbarment, as is attested to by ample evidence in the record, and as found by the panel, the petitioner has demonstrated that whatever weaknesses of character led to his serious misconduct, they no longer implicate his present fitness.

2. *Effect of reinstatement on the integrity of the bar*. Since we are satisfied that the petitioner is presently trustworthy, we also agree that he has met his burden of demonstrating that "his reinstatement would not be detrimental to the public welfare." *Id*. at 460 n.19. There remains, however, the question of public perception of reinstatement of an individual disbarred for the sort of offenses involved in this matter. The primary considerations here involve the impact of reinstatement on the

extortionary means. In view of the fact that this agreement is part of the settlement of a civil law suit, a settlement which the client has apparently not sought to revoke in the appropriate forum, we give no weight to the client's allegations.

deterrence function served by the disciplinary process, *Matter of Gordon*, 385 Mass. 48, 55 (1982), and the reputation of the bar for integrity, *id.* at 58.

Previous decisions of this court have weighed the position and experience of the petitioner at the time of disbarment, the degree of notoriety of the offenses, and the effect of the passage of time on public perception, as well as the nature of the offense. See *Matter of Allen*, 400 Mass. 417 (1987); *Matter of Gordon, supra; Matter of Centracchio*, 345 Mass. 342 (1963). "The nub of the question is whether his resumption of practice will have an actual effect upon the integrity of the bar and thereby on the administration of justice and the public interest." *Matter of Gordon, supra* at 52.

The perception of the public of the petitioner's reinstatement and the effect on public confidence in the bar is not easily susceptible of proof, especially where, as here, the offenses occurred in the private sphere of the attorney-client relationship and did not result in public scandal. It is significant, however, that, with the exception of the petitioner's former client, there is no recorded opposition to the petitioner's reinstatement.[4]

Instead, the record reveals letters from approximately thirty-two Massachusetts attorneys and two judges who attest to the competence, diligence, and integrity of the petitioner as a practicing attorney up until 1982. Those who addressed the misconduct leading to disbarment viewed it as an isolated incident which should not now prevent reinstatement. Significant also, in so far as issues of public perception are concerned, are the views of those nonattorneys in West Virginia who wrote in support of the petitioner's reinstatement despite familiarity with the circumstances leading to his disbarment.

We are satisfied that the board was correct in concluding that the petitioner has proved himself trustworthy, that his resumption of practice poses no threat to the public welfare, and that the integrity of the bar will not be compromised by the reinstate-

---

[4] The standing committee on legal ethics of the Massachusetts Association of Criminal Defense Lawyers submitted a letter but took no position on the question of reinstatement.

ment of an individual who, despite serious professional misconduct nearly fifteen years ago, has experienced the "chastening effect of a severe sanction." *Matter of Hiss, supra* at 454. We therefore remand the case to the Supreme Judicial Court for the county of Suffolk for entry of an order reinstating the petitioner as a member of the bar of the Commonwealth of Massachusetts.

*So ordered.*