## In the Matter of an Application for Admission to the Bar of the Commonwealth.

Suffolk. January 3, 2005. - June 1, 2005.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Sosman, & Cordy, JJ.

*Attorney at Law,* Admission to practice. *Supreme Judicial Court,* Membership in the bar. *Practice, Civil,* Membership in the bar.

Statement of the standard for the admission of attorneys to the Massachusetts bar. [397-398]

This court concluded that in a proceeding concerning a petitioner's application for admission to the Massachusetts bar, the board of bar examiners erred in allowing the petitioner to present evidence that his guilty pleas in a criminal matter were made for reasons other than guilt, where allowing such evidence was inconsistent with S.J.C. Rule 4:01, § 12 (2), which provides that a guilty plea shall be conclusive evidence of the commission of that crime. [398-399]

This court concluded that the petitioner, an applicant for admission to the Massachusetts bar, failed to satisfy his burden of proving that he is currently fit to practice law, where the petitioner's submissions in the context of other legal proceedings, to the board of bar examiners, and to this court demonstrated conduct that raised significant doubts concerning the petitioner's character and fitness to practice law. [399-415]

Petition filed in the Supreme Judicial Court for the county of Suffolk on June 14, 1996.

The case was reported by *Spina,* J.

*Kenneth B. Krohn,* pro se.

*Edward J. Barshak* for Board of Bar Examiners.

By the Court. In 1996, Kenneth B. Krohn (petitioner) applied for admission to the Massachusetts bar. Because the petitioner had been convicted of two felonies, the Board of Bar Examiners (board) conducted an investigation. By a three-to-two vote, the board declined to recommend the petitioner for admission to the bar. The petitioner appealed to a single justice, who reserved and reported the matter to the full court. Because we conclude that the petitioner, by his submissions, including his submissions to this court, has failed to satisfy his burden of

394                                      444 Mass. 393 (2005)

In the Matter of an Application for Admission to the Bar of the Commonwealth.

proving that he is currently fit to practice law, we deny his application for admission to the bar.

*Facts and procedural background.* In 1977, the petitioner pleaded guilty, in Federal court, to two felonies, conspiracy and extortion. His convictions were brought to the board's attention through a personal statement submitted with a letter of support to the board from an associate dean of his law school.[1] Consequently, the board investigated his fitness for admission to the bar.[2] The board held hearings[3] at which the petitioner testified.

The petitioner testified before the board that a Mexican national (victim) had swindled him out of a large sum of money in the early 1970's, at a time when the petitioner was living in Mexico under the alias Henry Blackwell. The petitioner was charged with kidnapping but pleaded guilty to the lesser offenses. At his plea hearing, he admitted that he and another individual used a false identity to lure the victim to Dulles International Airport for purposes of extorting the money.[4] The petitioner admitted that his coconspirator met the victim at the airport and took him to a car "rented by [the petitioner], using [a] . . . credit card" under another false name. The victim was taken to an apartment in Maryland that had been rented and was "coerced to write approximately seven letters to member of [the victim's] family." The letters were in the victim's handwriting and had the petitioner's fingerprints on them. The letters instructed various persons to dismiss a lawsuit the victim had instituted against the petitioner, and to transfer assets to the petitioner (i.e., Henry Blackwell). As part of the plea, the government agreed not to prosecute the petitioner for any other crimes related to the case and the petitioner expected to serve

---

[1]While the petitioner was in law school, he needed permission to participate in a field work class pursuant to S.J.C. Rule 3:03, as amended, 418 Mass. 1302 (1994). He informed the court of his convictions at that time.

[2]As discussed *infra*, the petitioner did not believe that his felony convictions would be investigated by the board.

[3]Except where relevant, we make no distinction between the specific hearings and refer to a single hearing.

[4]The petitioner and his coconspirator used fictitious names and contacted American business associates of the victim, pretending that they were interested in a legitimate business transaction with the victim.

approximately three and one-half years in prison. The petitioner was sentenced to ten years' imprisonment and he served approximately three years of his sentence.[5]

These felonies are very serious and were, one may fairly conclude, committed as retribution for a wrong perpetrated on the petitioner by the victim. At the time the petitioner committed the crimes, in 1973, he was thirty-five years old, and held a master's degree and a doctorate from Harvard University, which he earned in the 1960's. His doctorate is in mathematics. He was accomplished in his field. He coauthored a computer science theory that was published in a textbook. He had owned, and sold at a profit, his own computer business, making him financially secure. He also owned property in the District of Columbia. See *Matter of Prager*, 422 Mass. 86, 96 (1996) (admission to bar denied despite board recommendation for admission; at time applicant committed felonies, he was mature, well educated, and possessed adequate financial resources).

The petitioner submitted numerous letters in support of his application for admission, each of which attested to his present good character, including his generous devotion of time to helping others.[6] One supportive letter was from a law professor who supervised the petitioner's field work and also testified on his behalf at his hearing before the board. Two labor law attorneys also wrote letters stating that the petitioner's representation (while he was a law school student) of an employee of the Po-

---

[5]By pleading guilty, the petitioner avoided a trial whereby his coconspirator, consistent with statements he made to the Federal Bureau of Investigation (F.B.I.), would likely have made allegations that the petitioner murdered the victim and dismembered his body, and that the victim's body was put in a trunk and thrown into Chesapeake Bay.

[6]This court has stated that letters from people who knew a person's character both before and after their wrongdoing and whose evaluations reflect that fact are most helpful. *Matter of Prager*, 422 Mass. 86, 99 (1996), citing *Matter of Rowell*, 305 Or. 584, 590 (1988). Although many letters written on behalf of the petitioner were from people who knew him for a long time, all but one of the letters were submitted by individuals who have known the petitioner only since his release from prison. The letter from the individual who knew him prior to his incarceration did not address the changes in the petitioner since that time. In fact, the letter does not mention the felony convictions at all. Only one witness knew the petitioner from about the time the felonies were committed. Her understanding of the felonies was based on what the petitioner told her and did not comport with what he admitted at his plea hearing.

laroid Corporation during a proceeding involving the National Labor Relations Board (NLRB) (discussed *infra*) resulted in a determination that a company union was illegal, and both letters praised the petitioner's contribution to the community. The petitioner also called character witnesses at his hearing, who stated that they believed that he had a good character.

The board issued a report on October 8, 2003.[7] The board gave the petitioner "the benefit of the doubt in respect of his criminal and litigation history."[8] However, based on a letter that the petitioner sent to counsel for the Polaroid Corporation during a dispute involving the NLRB matter and on two of the petitioner's submissions to the board, the board listed sixteen instances of conduct that caused it concern.[9,10] In his submissions to the board, the petitioner accused the board of bad faith and misrepresentation, accused pro bono counsel for the board of bad faith, attacked the legal system in general, and the

---

[7]We deny the petitioner's motion to strike the votes of two board members because one attended only one of the petitioner's hearings before the board and the other did not attend any of the hearings because she was appointed to the board subsequent to the hearings. The motion, even if allowed, would not change the result. All of the board members agreed on the factual findings. Striking two votes would still leave the factual findings undisturbed. Our decision is based on the board's unanimous factual findings, other undisputed facts in the record before the board and in the petition and submissions to this court, and our review of the entire matter de novo. See *Wei Jia* v. *Board of Bar Examiners*, 427 Mass. 777, 782 (1998) ("While we grant substantial deference to . . . the board . . . we have the final authority to determine who may practice law in the Commonwealth").

[8]Because the petitioner had initiated several lawsuits in the past, the board was concerned with litigiousness. The petitioner instituted several suits concerning his conviction, including a Federal suit against the attorney who represented him during his plea and a suit against Harvard Law School. We need not disturb the board's finding that it drew no negative inferences from this litigation.

[9]The two submissions relied on by the board were: "Applicant's Memorandum of Points and Authorities in Support of His Petition for Admission to the Bar" (memorandum) and "Applicant's Objections to Proposed Findings of Fact and Conclusions of Law by Counsel to the Board of Bar Examiners" (objections). The memorandum was submitted before the final hearing before the board.

[10]We have reviewed the record and considered the petitioner's arguments concerning the findings and conclude there is no reason to disturb them. Any errors are minor and do not affect the substance of the findings.

character of Federal officials who were involved in his criminal case in particular.

All members of the board agreed with the findings set forth in the board's report, but they disagreed over whether the findings concerning the petitioner's conduct supported the conclusion that he possessed a serious character flaw, rendering him unfit to practice law. The dissenters stated that the petitioner's memorandum and objections, however offensive, represented a temporary "siege mentality," and the "uncomely hubristic aspect of his personality" did not render him unfit.

*Standard for admission to the bar.* The right to practice law "is a peculiar privilege granted . . . to those who demonstrate special fitness in intellectual attainment and in moral character." *Matter of Prager*, 422 Mass. 86, 101 (1996), quoting *Matter of Keenan*, 314 Mass. 544, 546-547 (1943). "The license to practice law may not be withheld arbitrarily or discriminatorily." *Matter of Prager, supra* at 90.

"The commission of a felony is . . . conclusive evidence of lack of good moral character at the time of the offense," *id.* at 91-92, but a "prior conviction is not an absolute bar to admission . . . [if the applicant can make] a showing of present moral fitness." *Id.* at 91. An applicant who has been convicted of a felony must prove sufficiently "the requisite moral qualifications," thereby showing that being allowed to practice would not be "detrimental to the integrity of the bar, the administration of justice, or the public interest." *Id.* at 93, citing S.J.C. Rule 4:01, § 18 (5), as amended, 394 Mass. 1106 (1985).[11] See *Matter of an Application for Admission for the Bar*, 431 Mass. 678, 681 (2000). "Any significant doubts about an applicant's character should be resolved in favor of protecting the public by denying admission to the applicant." *Matter of Prager, supra* at 100, quoting *Matter of Jaffee*, 319 Or. 172, 177 (1994).

---

[11]In *Matter of Prager*, 422 Mass. 86, 92, 101 (1996), the court went on to say that once the board conducts a thorough investigation into all facts concerning whether the applicant can inspire public confidence, it should also make findings of fact regarding the five factors for assessing reinstatement of an attorney established in *Matter of Hiss*, 368 Mass. 447, 452 (1975). We have addressed some of the factors discussed in the *Hiss* case, but focus now only on current character.

Attorneys must conduct themselves in such a way that they dedicate themselves to the peaceful settlement of disputes and respect the role of courts in the administration of justice. See *In re Snyder*, 472 U.S. 634, 644-645 (1985); *Law Students Civil Rights Research Council, Inc.* v. *Wadmond*, 401 U.S. 154, 166 (1971). " '[R]estraint in dealing with others is obligatory conduct for attorneys . . . .' 'The profession's insistence that counsel show restraint, self-discipline, and a sense of reality in dealing with courts [and] other counsel . . . is based on the knowledge that civilized, rational behavior is essential [for the judicial system to function] . . . . [H]abitual unreasonable reaction to adverse rulings . . . is [unacceptable conduct in a lawyer]. *What cannot be permitted in lawyers, cannot be tolerated in those applying for admissions as lawyers.*' " *In re Application of Converse*, 258 Neb. 159, 170 (1999), quoting *In re Appeal of Lane*, 249 Neb. 499, 511, 513 (1996). Moreover, a practicing attorney who includes "disrespectful and irrelevant passages" and "allegations . . . totally without record support" may be subject to sanctions. *Avery* v. *Steele*, 414 Mass. 450, 451, 456 (1993). If an attorney's client is responsible for inappropriate material being submitted to a court, the client also may be subject to sanctions. *Id.* at 456.

*Discussion.* "While deference is given to the decision of the board, this court retains ultimate authority to decide a person's fitness to practice law in the Commonwealth." *Matter of Prager, supra* at 91. See note 7, *supra*; *Wei Jia* v. *Board of Bar Examiners*, 427 Mass. 777, 782-783 (1998). See also G. L. c. 221, § 37.

We have reviewed all the documents in the record and all submissions to this court and are left with significant doubts concerning the petitioner's character and fitness to practice law. *Matter of Prager, supra* at 100. Accordingly, we conclude that the petitioner has failed to meet his burden of demonstrating that his admission to the bar would not be "detrimental to the integrity of the bar, the administration of justice, or the public interest." *Id.* at 93, citing S.J.C. Rule 4:01, § 18 (5).[12] See *In re Application of Converse, supra* at 170-171, quoting *In re*

---

[12]We address herein the major claims made by the petitioner. The claims we do not address are rejected as without merit.

444 Mass. 393 (2005)                                       399

In the Matter of an Application for Admission to the Bar of the Commonwealth.

*Appeal of Lane, supra* at 511. However, before we begin our discussion of the reason for our conclusion, we address an error the board made in admitting evidence concerning the petitioner's convictions.

Initially, the board decided it was bound by the petitioner's guilty plea, the voluntariness of which was affirmed by United States *vs.* Krohn, No. 79-6316 (4th Cir. June 20, 1980). *Matter of Prager*, 422 Mass. 86, 88, 89, 91-92 (1996) (guilty plea conclusive evidence of lack of good moral character at time). Relying, inter alia, on *Aetna Cas. & Sur. Co.* v. *Niziolek*, 395 Mass. 737 (1985) (in subsequent civil litigation, guilty plea merely admissible as evidence of guilt), the petitioner asserted in his memorandum (see note 9, *supra*) that his plea of guilty constituted only some evidence of guilt and that he was entitled to present evidence that he pleaded guilty for reasons other than guilt. The board was persuaded and allowed the petitioner to present such evidence. This was error and should not have occurred.[13]

Allowing such evidence would be inconsistent with the rule applied to practicing attorneys subject to disciplinary proceedings. Supreme Judicial Court Rule 4:01, § 12 (2), as appearing in 425 Mass. 1313 (1997), states that "[a] conviction of a lawyer for any crime shall be conclusive evidence of the commission of that crime in any disciplinary proceeding." The term "conviction" includes a guilty plea.

We now discuss the reasons for our conclusion that the petitioner has not met his burden of proving his fitness to practice law, beginning, in chronological order, with examples from the petitioner's submissions in various legal contexts, including submissions to this court and to the board.[14]

1. *The petitioner's submissions in other legal contexts.* a. In

---

[13]A Federal court has already addressed the petitioner's claim that a new piece of evidence allegedly proves his innocence; the court concluded that the substance of the evidence (that the government had no immigration or customs documents reflecting the victim's entrance into the United States, discussed *supra*) was known to the petitioner at the time of his plea. United States *vs.* Krohn, Crim. No. 77-162-A, Civil Action No. 81-120-A (E.D. Va. May 11, 1981).

[14]In defending his actions, one of the petitioner's arguments is that it is a violation of his due process rights for the board to have used the documents

1995, while the petitioner was a law school student, he acted as a representative for an employee of Polaroid Corporation (Polaroid) in a proceeding involving the NLRB. In its report, the board expressed concern about two documents the petitioner sent to the attorney representing Polaroid during the course of the NLRB process. One document was apparently an internal Eastman-Kodak Company document and there was, as well, an internal Polaroid memorandum concerning it. In the letter to Polaroid's attorney, the petitioner stated that he had "come across a most troubling pair of documents" in the course of his "research and preparation on behalf" of his client in the matter before the NLRB. The petitioner stated that the documents appeared to be authentic and:

> "Polaroid seemingly could only have obtained the internal Kodak memorandum in question through unauthorized means. My follow-up inquiry into this matter moreover suggests to me that the attached documents represent merely the tip of an ice-berg which, furthermore, also involves organizations other than Kodak. As a matter of courtesy, I have decided to advise you of the above-described situation because the action which I contemplate taking potentially could publicly embarrass your client. Unless you care to persuade me before Friday, April 8, 1994 either that the memoranda in question are not genuine or that Polaroid had come into possession . . . in a licit manner . . . I intend to transmit both memoranda along with certain supplementary material to legal counsel for Kodak in order to enable Kodak to initiate whatever proceedings it may deem appropriate to recover for any wrongful injury which Polaroid has caused Kodak through

___

he submitted to it against him without warning. This argument has no merit. Due process requires that an applicant be informed of the "charges" against him and provided with an opportunity to confront witnesses who supply information adverse to him. See *Matter of Tobin*, 417 Mass. 92, 101 (1994); *In re Application of Feingold*, 296 A.2d 492, 498 (Me. 1972), citing *Willner* v. *Committee on Character & Fitness*, 373 U.S. 96 (1963). In this case, the "charges" were known to the petitioner: his character and fitness for admission to the bar. The petitioner's own submissions during the course of the board's investigation are not "charges" against him, and therefore, no right of confrontation applies. Moreover, the petitioner's comments were solicited at the last hearing before the board and he has addressed the issues raised by the board in his petition to the single justice and in his brief to this court.

Polaroid's apparent misappropriation of Kodak's trade secrets and/or confidential commercial information."

The petitioner did send the documents to Kodak, and the petitioner's client was subsequently fired after Polaroid determined that she was the one who released them to the petitioner.[15] Concerning his decision to bring the documents to light, the petitioner testified before the board that he was not threatening Polaroid. He stated that his sole motive was to "solidify derogatory material about Polaroid for distribution to the employees in support of the union." He thought that if he could show that Polaroid stole documents from Kodak, it would make Polaroid look bad. He also testified that he was "irked" that the attorney for Polaroid had sought to have the petitioner disqualified as the client's representative by releasing a copy of his plea agreement to the appeals department of the NLRB.

We agree with the board that the petitioner's sending such a letter during the NLRB process is a cause for concern. We disagree with the petitioner's assertion that he was not threatening Polaroid. Moreover, even though the petitioner testified that sending the letter was "an error in judgment," there is nothing in the record to indicate that the petitioner recognizes that his overzealousness contributed to his client's losing her job. The petitioner did state that the reason the documents came to him anonymously was because employees were afraid of being discharged for coming forward with information. Given that this is what he believed about the employment environment at Polaroid, it is evidence of poor judgment concerning the well-being of his client for him to have sent the letter, seemingly without contemplating the risk to which he may have been exposing his client.[16]

b. In 1995, the petitioner wrote a letter to Greater Boston Legal Services (GBLS) on behalf of another Polaroid employee

---

[15]The petitioner testified that, although he learned where they came from, he had received the documents anonymously; the petitioner also testified that despite the fact that the NLRB concluded that Polaroid had a good faith basis to discharge his client, the client was wrongly accused.

[16]Indeed, in his appeal to the NLRB's general counsel from the regional director's decision not to charge Polaroid with unjustly firing his client, the petitioner stated, "Since her dismissal, [my client] has been unable to find permanent employment, in large part because Polaroid routinely advises her prospective employers seeking a reference that [she] is an unreliable employee

who apparently was told by an attorney for GBLS that GBLS's interpretation of a statute prevented it from introducing certain testimony at the employee's arbitration. GBLS apparently told the employee that he was free to retain other counsel if he was unhappy with GBLS's decision. The petitioner sent a letter protesting the decision in which he, inter alia, (1) stated, in the heading, that the letter was regarding "suggestion of apparent serious ethical problem," (2) stated in the first paragraph that GBLS's handling of the case "appears to present a serious ethical question," and (3) suggested that GBLS was not living up to its ethical duty zealously to represent its clients.

2. *The petitioner's submissions to this court.* a. The following exchange occurred during one of the board's hearings as the petitioner offered in evidence an exhibit that contained materials related to his conviction:

CHAIRMAN BARSHAK:    "Next we will take into evidence [petitioner's exhibits related to his criminal conviction]. We're admitting it all into evidence. It may serve more purposes than you have in mind, sir."

THE PETITIONER:    "Well, can I please?"

CHAIRMAN BARSHAK:    "No please. This is not a conversation, we have to follow the rules. You have to wait for the questions."

THE PETITIONER:    "Okay."

In paragraph number four of its report, the board noted the petitioner's reaction to this exchange, in which he accused Barshak of calling him "simpleminded," as one of its reasons for concern over the applicant's conduct.

In his petition to the single justice, the petitioner answered paragraph number four by stating that its first sentence "cites applicant's words out of context, apparently for the purpose of demonstrating a purported example of lack of civility by applicant in berating [a] former attorney." He then elaborated on what he had written in his memorandum, to which the board had taken exception, as follows:

who betrayed the trust which Polaroid had placed in her by pilfering proprietary company documents."

"The condescending barb which Chairman Barshak directed to applicant about what applicant may have had in mind when he offered Exhibit '14' into evidence was wholly gratuitous in that it contributed nothing substantive to the proceeding and, by way of aggravation, was completely unprovoked by anything which applicant had previously said or done. Chairman Barshak clearly made the comment for the sole purpose of demeaning applicant before his wife and others present by belittling applicant's judgment. The clear gist of the remark was that applicant, in his simplicity, did not understand, as did Chairman Barshak in his wisdom, that the exhibit which applicant had offered into evidence might be more detrimental than beneficial to applicant's case. The offensiveness of the remark from applicant's point of view was magnified by the extremely broad discretion within which Chairman Barshak and the rest of the Board may operate in making the highly subjective determination of whether applicant is morally fit to be an attorney, which circumstances chilled applicant from responding more insistently."

He included a footnote that stated that by the exchange quoted above, "Chairman Barshak silenced the applicant when applicant sought, by way of response, to explain why he had prepared and offered Exhibit '14' into evidence."

The petitioner concluded by stating that his objection to Mr. Barshak's remark was justified because members of the board *should* be bound by the same rules that govern the conduct of judges. Although board members are not, in fact, bound by the rules that govern judicial conduct, the petitioner alleged that Barshak "infringed that provision when he gratuitously humiliated the applicant by directing the above-quoted barb at him." By way of a footnote, the petitioner also brought to the single justice's attention "what appears to be a serious gap in the legal framework which presently governs the functioning of the Board of Bar Examiners; namely, the absence of a pertinent code of conduct . . . and of an entity with authority to investigate and discipline complaints about violations of that code [because] an applicant who has been subjected to abusive language by a

member of the [b]oard . . . may not validly complain about that conduct . . . ."[17]

The exchange with Barshak occurred while certain procedural issues (admission of exhibits) were being dealt with. The petitioner was attempting to inject his statement into the process and was prevented from doing so. The petitioner's reaction is not in keeping with being able to deal with a "sense of reality" in dealing with the legal system. *In re Application of Converse*, 258 Neb. 159, 171 (1999), quoting *In re Appeal of Lane*, 249 Neb. 499, 513 (1996). His conclusion that the remarks were designed to humiliate him led him to make arguments that are beyond the bounds of legitimate argument.[18] *Avery* v. *Steele*, 414 Mass. 450, 456 (1993).

b. During the course of the petitioner's application process, one board member, the late John Dunn, recused himself. Before addressing the petitioner's discussion of Dunn in his submissions to this court, we provide some context.

In an affidavit submitted to the board, the petitioner states that when he was first thinking about attending law school, he was concerned about how his felony convictions might affect his eventual application for admission to the bar. He obtained a copy of the application for admission form and noticed that, at that time, the question about felony convictions (Question 11)

---

[17]The petitioner returned to this point in the postscript to his brief entitled "Additional Innermost Feelings and Personal Views." There, the petitioner accused the board of "reflexive bureaucratic retaliation," lacking in candor, and lacking in understanding of basic legal principles, all of which would subject its members to bar discipline.

[18]Moreover, the petitioner had a similar reaction to statements made to him in 1995 by the administrative law judge who heard an NLRB matter concerning Polaroid (the petitioner, who at that time was in law school, represented a Polaroid employee).

At one point in the proceeding, the judge was trying to deal with the question whether a stipulation was factually correct. Although the judge clearly stated six times that he later would allow the petitioner to state his views, the petitioner kept insisting that he be heard. The judge twice stated that he would allow the petitioner to "sound off." When the petitioner brought these words to the judge's attention, the judge apologized. Nevertheless, in two documents he submitted subsequently during the NLRB process, the petitioner returned to the "sound off" comment. In one document he stated that the judge, "(much to the delight of the Respondent's three attorneys) despectively characterized as 'sounding off' the [the petitioner's] prospective efforts."

asked applicants to reveal felony convictions within the previous seven years. He states that he also spoke to the then executive director of the board and was assured that the board was only interested in felonies that occurred within seven years. He states that, relying on this information, he applied to and attended law school. However, when he applied for admission in 1996, the board did take into account his felony convictions.[19]

In addition, before the petitioner pleaded guilty to the two felonies in 1977, he had been arrested twice before concerning the same crime, but was not prosecuted. During his first arrest in 1973, he retained an attorney, James M. Pool, to represent him. *Matter of Pool*, 401 Mass. 460, 461 (1988). Attorney Pool was later disbarred because, during the course of his representation of the petitioner, Pool committed a "serious breach of client confidentiality [and] fail[ed] to disclose significant facts" to the petitioner that affected the amount of fee he received.[20] *Id.* at 460-461.

John Dunn apparently represented Pool in a lawsuit filed by the petitioner against Federal officials and Pool and was a

---

[19]The convictions were brought to the attention of the board by a letter from an associate dean of the petitioner's law school and through the petitioner's personal statement submitted therewith. In 1996, the law school certificate confirming that an applicant was graduated from the law school required the law school to submit any information that was adverse as to an applicant's moral character or fitness to practice law. The board is required to consider all matters that are material to a person's good moral character. See S.J.C. Rule 3:01, § 5.1, as appearing in 411 Mass. 1321 (1992). See also *Matter of Prager*, 422 Mass. 86, 101 (1996). Moreover, S.J.C. Rule 3:01, § 4.1, as amended, 397 Mass. 1212 (1986), requires the board publicly to publish the names of applicants so that objections can be made. Thus, the petitioner's argument that the board's consideration of his felonies was improper and discriminatory because a question on his application form only inquired about felonies no older than seven years is without merit.

[20]The petitioner told Pool that he had safe deposit boxes that contained cash, a gun, and false identifications. The only available keys were in the possession of the F.B.I. Unbeknownst to the petitioner, Pool entered into an agreement with the assistant United States attorney to provide Pool with keys to the petitioner's safe deposit boxes so that Pool could retrieve money for the petitioner's defense, in exchange for the government's learning the location of the boxes and the aliases under which they were listed. *Matter of Pool*, 401 Mass. 460, 461-462 (1988). "[B]ased on an affidavit that was at best obscure as to the source of the information, the F.B.I. obtained a search warrant" and gained access to the boxes and their contents. *Matter of Pool*, 4 Mass. Att'y Discipline Rep. 112, 114 (1984).

character witness for Pool during proceedings before the Board of Bar Overseers.

In paragraph five of its report, the board noted the petitioner's reaction to Dunn as one of its reasons for concern over the applicant's conduct. The petitioner accused Dunn of sharing information that Dunn allegedly received from Pool with other board members, thereby prejudicing his application. In addition, in his memorandum, the petitioner also stated that the recusal of Dunn would not be enough to satisfy his concern. However, after the petitioner submitted his memorandum, Dunn recused himself so that he would not take part in the board's decision, and the board reconsidered and decided (erroneously, discussed *supra*) to allow the petitioner to present evidence of his innocence.

Despite the petitioner's persuasion of the board to hear this evidence, Dunn's recusal before a final board recommendation on the petitioner's application, the fact that the board stated that it would not draw any adverse inferences from the petitioner's convictions, and the fact that this court, although granting a deference to a recommendation of the board, reviews the record de novo, the petitioner has persisted in using Dunn as a vehicle to attack the entire board. He alleges in his brief (without support in the record) that the reason the board considered the convictions at all was because of Dunn's influence over the board. He asserts that Dunn was the reason the board denied his motion to exclude the felony convictions, declined discovery motions and other requests, and did not issue reasons for its decision to deny the petitioner's requests, and states that the board's treatment of his felonies is different from the way the board has handled other applicants' felonies. In fact, in a footnote in his brief, the petitioner states: "Note also the enormous disparity to applicant's detriment in the treatment afforded the applicant in this matter compared with the revolving-door reinstatement accorded to applicant's disbarred former attorney."

Pool's reinstatement was the subject of a decision by this court. *Matter of Pool*, 401 Mass. 460 (1988). The petitioner's characterization of that ten-page decision as a "revolving-door reinstatement" is unwarranted and impugns the work of the

court.[21] Moreover, the petitioner acknowledges that he has no proof of his assertions about Dunn's alleged influence over the board, but states that if the court will grant his requests for an evidentiary hearing and discovery, he might be able to prove it. The petitioner's assertions of impropriety and his statement that he might be able to prove the assertions are not enough of a showing for us to order either discovery or an evidentiary hearing. See, e.g., *Commonwealth* v. *Goodreau*, 442 Mass. 341, 348-349, 355 (2004) (judge did not abuse discretion in denying motion for new trial without evidentiary hearing where defendant's submissions did not contain sufficient credible information to "cast doubt" on assessment of competency).

c. One particularly egregious claim impugns the integrity of both the board and, albeit indirectly, the Justices of this court. In his brief and his petition to the single justice, the petitioner discusses that the board mentioned that he had not been accepted into Harvard Law School twice in its report. The board mentioned it once in connection with its statement that it would not draw adverse inferences from his involvement in litigation and once in connection with a disparaging remark the petitioner made about bar counsel in his objections document. In the objections document, the petitioner himself made particular reference to the Harvard lawsuit.

The petitioner's lawsuit against Harvard Law School was the subject of an opinion by the United States Court of Appeals for the First Circuit. *Krohn* v. *Harvard Law Sch.*, 552 F.2d 21 (1st Cir. 1977). In his petition to the single justice, the petitioner spent several paragraphs criticizing the board for not stating in its report that the lawsuit occurred in 1975, "manifest[ing] a complete disinterest in hearing applicant's explanation of the considerations which had prompted him to file the lawsuit in the first place,"[22] and the inaccuracy of the board's statement

---

[21]In the postscript to his brief, the petitioner also asserted in a footnote that this court's "practice of routinely reappointing bar examiners . . . as a practical matter confer[s] lifetime tenure of bar examiners . . . [and] foster[s] within the board the development of a laxity as that which the [b]oard has exhibited in the instant matter." See note 17, *supra*.

[22]As evidence, the petitioner quoted the following exchange at his hearing:

BOARD MEMBER RICHMOND: "What did the appeals court say?"

that his lawsuit was based on a contention that Harvard College was created by the Constitution of the Commonwealth, when it was created by the "General Court of the Massachusetts Bay Colony in 1636."

Concerning this last point, the petitioner states:

> "[The board] incorrectly imputed to applicant the allegation in that lawsuit of patently untrue historical facts as the basis for applicant's at first blush unreasonable legal theory therein, thereby suggesting on the part of applicant a degree of crass ignorance and an utter lack of realism. It is as though the Board by this device has sought to send to this Court — a number of whose justices are furthermore graduates of or have been closely connected with Harvard University and/or its law school — a subliminal message discrediting applicant as a person not to be taken seriously. Having previously observed elsewhere the use with devastating effect of such a less than commendable tactic, applicant intends by this discussion to forestall the profitable use of such an illegitimate subliminal message here."

In addition, in the statement of facts in his brief to this court, the petitioner states in a footnote that these references, inter alia, "thereby insinuat[e] the existence in applicant of a degree of personal mediocrity for having been rejected or presumption for having applied in the first place." In a footnote he also responds to the board dissenters' statement that he had an "uncomely hubristic aspect of his personality" by stating: "applicant hopes that he is not again 'demonstrating an uncomely hubristic aspect of his personality' . . . by here affirming his belief that his view of Harvard's legal status is compelled by a

---

THE PETITIONER: "Well, it's interesting I have to . . . ."

BOARD MEMBER MULDOON: "Excuse me. Did they affirm or?"

THE PETITIONER: "They affirmed but . . . ."

BOARD MEMBER MULDOON: "Please."

CHAIRMAN BARSHAK: "We can read the opinion."

BOARD MEMBER MULDOON: "Please."

THE PETITIONER: "All right, all right."

principled application of . . . law [in light of] the history of Harvard and [governing] statutes."[23]

We allow the petitioner's tendency to recrimination to speak for itself and reject his argument that the board is trying to influence the Justices by its reference to the fact that the petitioner (who joins countless others who have been rejected) was not admitted into Harvard Law School. The argument is absurd with respect to the petitioner's allegations of the board's motivation. It is also disrespectful of the work of this court.[24]

d. In his reply brief, the petitioner responded to a comment in the board's brief stating that the pages in the record appendix before this court are mostly without serial page numbers. This statement is true. The pages in the volumes are not sequential as to each other (i.e., volume two begins on page 1, not page 410) and some pages have no visible numbers. The petitioner, after noting that he took care in his assembly of the volumes, chose to address the board's statement as follows:

> "The [b]oard inaccurately asserts that the 'record appendix [is not sequentially numbered]' and exploits that untruthful and unjustly disparaging statement as a pretext to excuse its systematic failure to support by proper reference to the Record Appendix frequently inaccurate and/or

[23]The petitioner again raised the "hubristic" comment in his reply brief, when he was responding to the board's argument that the petitioner's due process argument was premised on the assumption that he should have been warned not to submit improper memoranda. The petitioner spent over two pages arguing that this was a material misrepresentation of his due process claims and called for sanctions lest "lesser attorneys, future applicants and the public . . . reasonably draw [a] . . . cynical conclusion." He then added a footnote that stated, in part: "Applicant hopes that the Court not find applicant to have exhibited 'uncomely hubris' . . . unbefitting his lowly station by venturing herein to comment with all sincerity upon the troubling incongruity of the presence in the Board's brief of a gross misrepresentation to applicant's detriment — not very dissimilar to those repeatedly made by counsel to the Board in their submission to the Board . . . ."

[24]The petitioner articulated a similar theme while he was still serving his sentence. He argued, in an affidavit he submitted in support of his motion for relief pursuant to 28 U.S.C. § 2255, that one of the reasons he pleaded guilty was because, if he went to trial, was convicted and appealed, he believed that his appeal would not get a fair hearing before the United States Court of Appeals for the Fourth Circuit. He also asserted that there was a "cozy relationship" between the law clerks of the justices on the panel and the prosecutors.

misleadingly incomplete assertions of fact throughout its brief."

In their submissions to this court, attorneys address errors in one another's briefs and submissions, even where, as here, it was not necessary. The level of care the petitioner took in assembling the record appendix, as well as veracity of the board's statement concerning pagination, are obvious as the court conducts its review of the case. We do not deny the petitioner's right to try to correct what he perceives to be an error. However, especially because what the board stated was not an error, we are troubled by the petitioner's personalization of the issue.

e. In paragraph six of its report, the board identified the petitioner's irrelevant personal attack on a former United States magistrate, accusing him of giving "corrupt" assistance to James Pool as a cause for concern. In his brief, the petitioner again includes this irrelevant and unsupported attack.

This attack on the legal system is inappropriate and does not comport with the professionalism that is required of an attorney. In *Matter of Hiss*, 368 Mass. 447, 448 (1975), Hiss maintained his innocence despite his conviction of two counts of perjury. There was no hint in the facts that Hiss engaged in any unprofessional conduct or made any frivolous, unsupported, or libelous accusations against any tribunal. *Id.* at 467 (noting that "[h]is testimony contained no hint of present animosity or grudge against those who convicted him. The conviction itself had not shaken his faith in the judicial system"). Like Hiss, the petitioner maintains his innocence. Of course, the petitioner is not required subjectively to maintain a personal trust in the legal system. However, whatever his subjective views of the legal system, his unprofessional, unsupported attacks on not only the Federal system, but also on the work of this court, and the work of the board, do not demonstrate the requisite professionalism, respect, and demeanor required of an attorney. The petitioner's approach in this regard raises substantial concern about his fitness to practice law. *Matter of Prager, supra* at 100.

3. *Petitioner's defenses.* The petitioner has acknowledged that if his conduct had occurred during a civil proceeding, it would

be unacceptable. See *Avery* v. *Steele*, 414 Mass. 450, 456 (1993); *In re Application of Converse*, 258 Neb. 159, 171 (1999). However, he contends that he was required by the holding in *Matter of Prager*, 422 Mass. 86 (1996), to reveal his innermost thoughts and feelings concerning morality, and that is exactly what he did through his various submissions to the board and the court. This argument has no merit.

In *Matter of Prager*, *supra* at 100-101, the court set out guidance to the board on inquiries concerning an applicant's character. The court stated: "A hearing to determine character and fitness should be more of a mutual inquiry for the purpose of acquainting this court with the applicant's innermost feelings and personal views on those aspects of morality, attention to duty, forthrightness and self-restraint which are usually associated with the accepted definition of 'good moral character.' " *Id.*, quoting *In re Application of Davis*, 38 Ohio St. 2d 273, 274 (1974). The applicant is required to cooperate with the board's inquiry. *Matter of Prager*, *supra* at 101, citing *In re Application of Davis*, *supra*. The entire purpose of the application process is to determine the applicant's fitness to practice law. Accordingly, *Matter of Prager*, *supra*, invites the applicant to prove to the court that the *applicant* possesses the requisite fitness so that the court can be confident that allowing an applicant to practice law would not be detrimental to the public interest. *Id.* at 93-94. The conduct of someone else generally is not relevant to the exploration of the applicant's fitness because it sheds no light on the ultimate question: whether the applicant is fit to practice law. Repeated, unsupported, ad hominem attacks on the ethics, integrity, and motivations of others involved in the process do, however, reflect adversely on the applicant's fitness to practice law. Even assuming that *Matter of Prager*, *supra*, invites such an assessment of others, in order for the applicant to demonstrate he possessed the requisite fitness, his critique would have to be within acceptable bounds of argument, which the petitioner concedes his arguments are not.[25] It is the ascription of base or unethical motives to various individuals involved in the process,

---

[25]In his submission to the single justice, the petitioner spends much time arguing that his statements about bar counsel were fully warranted by the record. In his reply brief, he states that the board misapprehended his reasons for

without support in the record, that is the conduct that exceeds the bounds of legal argument.

In his brief to this court, the petitioner argues that he cannot be held accountable for the two documents on which the board relied in making its recommendation because his attorney is the one who submitted them.[26] However, the petitioner admitted in oral argument before the single justice that he wrote the first draft of both documents and submitted them to his attorney for her to edit and submit to the board.[27] Indeed, the memorandum makes frequent use of "we" as the pronoun of choice when arguments to the board are asserted. He also stated that *he* interspersed in the two documents his personal reservations about the conduct of those involved in his application and that he believed that *his* views were reasonable and fully warranted by the facts. At one of the hearings before the board, the petitioner accepted responsibility for the objections document, and went on to explain his reason for his accusatory tone concerning some of bar counsel's proposed findings. Moreover, the over-all tenor of the document is no different from the tenor of documents he submitted to this court. As his attorney's client, he could be subject to court sanctions if he was responsible for inappropriate material being submitted to a court. See *Avery v. Steele, supra* at 457. The same principle applies here.

The petitioner also argues that his statements were taken out of context by the board. We have read the petitioner's submissions in their entirety, and the argument is without merit.

4. *Other concerns.* We have discussed the fact that through his submissions in the context of other legal proceedings, to the board, and to this court, the petitioner has failed to prove his fitness to practice law, by leaving us with doubts about his character. *Matter of Prager, supra* at 100. We also note that the

---

attacking bar counsel, stating that he simply was trying to acquaint the court with his innermost feelings and thoughts concerning morality as required by *Matter of Prager, supra.*

[26]In his brief, the petitioner states that he did inject his personal views into the documents.

[27]His attorney submitted an affidavit that contends that while the petitioner "primarily researched and originally drafted" the two documents, she meticulously edited them, and they should be viewed as a "collaborative" effort no more attributable to the petitioner than to her.

petitioner has displayed a tendency to mischaracterize certain matters. Rule 8.1 of the Massachusetts Rules of Professional Conduct, 426 Mass. 1427 (1998), states: "An applicant for admission to the bar . . . shall not: (a) knowingly make a false statement of material fact; or (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter . . . ." We cite some examples.

a. In support of his motion to exclude his convictions from the board's consideration, the petitioner submitted an affidavit in which he stated: "In apparent violation of the Family Educational Rights and Privacy Act ('FERPA') of 1974, the law school felt at liberty to advise the [b]oard in 1996 of the conviction. I myself had not mentioned the 1977 conviction in the 'Applicant's Statement to Board of Bar Examiners' form which I had completed and submitted to the [b]oard in 1996." This statement, with its implicit attack on the integrity of his law school, does not tell the full story. It is true that he did not mention his convictions on the application. However, after discussing the conviction issue with an associate dean, the petitioner (then the applicant), rather than object to the dean's inclusion of this information, submitted a personal statement concerning his convictions to accompany the dean's letter to the board. Thus, the law school could not have violated his rights under FERPA, assuming such an act would constitute a violation.[28] Moreover, while he was in law school, the petitioner himself revealed his convictions to this court when he applied for permission to practice law in a field work class pursuant to S.J.C. Rule 3:03.

b. The petitioner asserts in his reply brief that the board's "lethargy or inactivity" is largely responsible for the seven years that elapsed from the time of his application for admission until the board's decision in 2003. In support of this assertion, he cites the fact that the date of his last hearing before the board was December, 2002, but the board did not issue its decision until October, 2003, despite letters from the petitioner indicating his concern over the delay. This ten-month time period is correct, but the petitioner omits two important facts.

---

[28] As discussed, see note 19, *supra*, the law school was required to disclose to the board any adverse information affecting the petitioner's ability to practice law.

414                                            444 Mass. 393 (2005)

In the Matter of an Application for Admission to the Bar of the Commonwealth.

First, the board responded to those letters, informing the petitioner that it had a voluminous record to review.[29] Second, much of the delay in the seven years it took to complete the proceeding is attributable to the petitioner. The petitioner and his attorney acknowledged that they were the cause of delay during one of the hearings. In fact, in 2000, the board did not receive documentation it requested. The board, in writing, apparently gave the petitioner a deadline by which the documents had to be submitted. When the petitioner failed to submit them, the board reported the petitioner as not qualified. After learning that the petitioner was out of the country, which was why he failed to respond, the board asked that the court restore his application status to active.

c. The petitioner asserted in his affidavit that accompanied the letter from the associate dean of his law school that he was released on parole after approximately three years because of conclusive proof of his innocence.[30] He also asserted this claim at one of the hearings. However, the petitioner testified that three years was part of the plea arrangement and that he took the plea based on probabilities. Moreover, a document in the record, created in 1979, shows that the petitioner was eligible for parole in December, 1980, approximately three years after his plea. There is nothing in the record discussing the reasons for granting parole to the petitioner.

*Conclusion.* Viewing the petitioner's conduct as a whole, we are left with significant doubts about his character and fitness and conclude that the petitioner has failed to meet his burden to prove that he is fit to practice law. While he was in law school, he sent a threatening letter to opposing counsel in the NLRB matter. He has attacked the United States Court of Appeals for the Fourth Circuit, a former United States magistrate, a former

---

[29]The board stated that it reviewed over 2,000 pages. Indeed, the documents submitted to this court comprise over 4,000 pages.

[30]The petitioner wrote in his affidavit: "Based upon [Immigration and Naturalization Service] records, the U.S. Parole Commission released me from prison at the earliest possible date lawfully consistent with my sentence and, in so doing, by necessary implication accepted my claims to it that I had been unjustly convicted. Otherwise, according to the Parole Guidelines then in force, I would have been required to serve the entirety of my sentence which, with allowance for 'good time,' would have amounted to two-thirds of the sentence rather than the one-third which I actually served."

member of the board and the board as a whole, and, indeed, this court's decision reinstating James Pool to the bar. Contrast *Matter of Hiss*, 368 Mass. 447, 467 (1975).

The petitioner asserts that if he misread the requirements of *Matter of Prager, supra,* he did so in good faith and, therefore, his submissions to the board should not be held against him. This argument has no merit. He was on notice that the content of his submissions would be an issue before this court, and he could have chosen to prove the board's dissenters correct in their assessment that the two submissions he made were anomalous. Instead, he chose to make submissions that continue in the same vein. Before this court, the petitioner has stated, inter alia, without record support, that the board was trying improperly to influence the Justices; that the board's behavior should subject its members to discipline; that this court's decision in *Matter of Pool*, 401 Mass. 460 (1988), was a "revolving-door reinstatement"; and that this court indiscriminately reappoints members of the board, essentially conferring lifetime membership on those members. The petitioner also continued an irrelevant attack on Federal officials.

Moreover, his penchant for hyperbolic and dramatic language about what he perceives to be misconduct by others shows a seeming lack of understanding of the seriousness of the accusations he makes. Given all of this, coupled with the petitioner's mischaracterizations of other matters, we cannot say that the petitioner has met his burden of proving that he is fit to practice law. Accordingly, we must resolve our doubts about his character "in favor of protecting the public by denying admission" to the petitioner.[31] *Matter of Prager, supra* at 100, quoting *Matter of Jaffee*, 319 Or. 172, 177 (1994).

The matter is remanded to the county court for entry of a judgment affirming the decision of the board.

*So ordered.*

---

[31]We also deny the petitioner's request for a refund of the costs of filing this appeal.